**Marceliana B. Vda. de MAGNO, Appellant,**

v.

**UNITED STATES of America et al.**

**No. 79–1852.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 22, 1980.
Decided Sept. 24, 1980.

John B. Warden, Washington, D. C., for appellant.

David V. Seaman, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed and William G. Kanter, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellees.

Before WALD and MIKVA, Circuit Judges and HOWARD T. MARKEY *, Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The question before the court is whether the district court has jurisdiction over an action challenging a decision of the Veterans' Administration (the "VA") which imposed a set–off of an alleged debt against a veteran's widow's life insurance benefits. The "debt" was the result of a VA decision which declared forfeit her VA pension benefits on the basis of a purported fraud. We conclude that the district court erred in concluding that it lacked jurisdiction to determine whether the setoff was proper, and remand for exploration of that issue.

Marceliana de Magno, a 70–year–old resident of the Philippines, is the widow of a United States serviceman who died in service during World War II of an illness contracted in a Japanese prisoner–of–war camp. Her husband owned a life insurance policy naming her as the beneficiary, issued by the United States as part of its National Service Life Insurance ("NSLI") Program.[1]

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. The NSLI "is the congressional mode of affording a uniform and comprehensive system of life insurance for members and veterans of the armed forces of the United States .... Premiums are very low and are waived during the insured's disability; costs of administration are borne by the United States; liabilities may

After his death, de Magno began to receive both her contractual insurance benefits and certain veterans' benefits.[2] She received monthly payments, which along with Social Security payments were apparently her sole support for almost 30 years, until 1973, when the VA determined that she had committed fraud in the course of a statement she had given the year before in relation to an investigation of another woman's right to receive veterans' benefits. Pursuant to 38 U.S.C. § 3503(a),[3] the VA declared forfeit her right to receive the gratuitous benefits, retroactive to the date of the allegedly fraudulent statement she had given. This created a "debt" of $2,980.50, and to collect this asserted debt, the VA withheld her life insurance payments as well, retaining her monthly payment as a "set off" against the asserted debt.

We have read and reread the administrative record and the briefs of the parties, and confess ourselves mystified at the action taken by the VA in this case. Either the VA is withholding, both from us and from de Magno, *all* evidence which would justify its conduct,[4] or this woman has been the victim of wholly arbitrary administrative ineptitude, leaving her impoverished for nearly four years.

A veteran's widow receives veterans' benefits only so long as she does not remarry. If she lives with a man and holds herself out openly in public to be the wife of that man, she is considered by statute to have remarried. 38 U.S.C. § 101(3). However, if she ceases living with the man and holding herself out as his wife, her benefits may be resumed. 38 U.S.C. § 103(d)(3). De Magno's troubles grew out of an investigation in 1971 of the application of a neighbor, Virginia Abraham, to have her benefits resumed, in which she alleged that she had ceased living with Pedro Paguira. Abraham's relationship with Paguira had resulted in termination of her benefits in 1953. De Magno was one of those questioned by the VA about Abraham, and her statement, given under oath to a VA investigator, constituted the alleged fraud on the agency:

"Q. Had she [Abraham] lived with any man in the relationship of husband and wife?

A. Yes, with Pedro Paguira.

be discharged out of congressional appropriations." *Wissner v. Wissner,* 338 U.S. 655, 658, 70 S.Ct. 398, 399, 94 L.Ed. 424 (1950). The program is governed by 38 U.S.C. §§ 701–725.

2. The Veterans' Act provides a variety of benefits to those who have served in the armed forces and their dependents. De Magno was first awarded death compensation, a benefit payable to the widows of servicemen who die in the line of duty during wartime, 38 U.S.C. §§ 321–22. Her award was later converted to dependency and indemnity compensation, a similar benefit with larger monthly payments. 38 U.S.C.. §§ 401–23. To distinguish these benefits from contractual life insurance benefits, we will refer to them hereinafter as "gratuitous benefits." *See* note 10 *infra.*

3. That section provides:
§ 3503. **Forfeiture for fraud**
(a) Whoever knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Veterans' Administration (except laws pertaining to insurance benefits) shall forfeit all rights, claims,

and benefits under all laws administered by the Veterans' Administration (except laws pertaining to insurance benefits).

4. One of the frustrations of this case is that apparently some of the relevant evidence is contained in the neighbor's file, which the VA refused to produce in district court, asserting that "the Privacy Act and the regulations of the Veterans' Administration prevent us from making any of those things available to the Court." Transcript at 35. We suppose it is possible that there is some damning evidence in the Abraham file demonstrating that de Magno was lying to help her neighbor defraud the VA, but we doubt it; it seems most likely that the "relevant evidence" is simply the other depositions of Abraham's neighbors described in the various opinions declaring de Magno's benefits forfeit, which in no way establish fraudulent intent. We assume this because the VA has argued, both here and before the district court, that the case is ripe for summary judgment on the record as it stands, and no mention is made anywhere of evidence beyond that described in de Magno's record. In any case, even if such damning evidence existed, it certainly has never been disclosed to her to allow her an opportunity to respond to it.

Q. Exactly, what was the nature of their relationship?

A. I do not know exactly what sort of relationship that was. You know, sir, it was not really one that was exactly like a wedded couple. I seldom saw the man with her–they never went out together in public–they never introduced each other to associates and acquaintances as being the wife or husband of the other–I really have never observed either of them to do that, and when I saw Virginia going to the church of her faith, she was always alone. I have yet to see her go out in public with the man. Based on this, I am inclined to say that they were just having an illicit affair.

Q. You talked in the past tense. Do I gather from you that Virginia and Pedro are not now engaged in their relationship as you had observed and related?

A. It seems like it, sir. I cannot be sure.

Q. Why are you not sure?

A. Because it is now quite some time that I have not seen Pedro around.

Q. How long have you not seen him around?

A. About 3 years now, or since 1969.

Q. Before that, did you see him often?

A. No. Just off–and–on.

.  .  .  .  .

"Q. How is Virginia known here generally as to her civil status?

A. She is known as a widow of a soldier who had an affair with a man.

Q. As of Jan. 1, 1971, what was the marital reputation of Virginia?

A. Widow.

Q. Since Jan. 1, 1971, has her civil status changed?

A. No. She is still considered a widow here.

Q. How does she actually talk of herself in respect to her civil status?

A. Widow." (App. 10–11).

Abraham lived on the same street as de Magno, and de Magno was one of a number of neighbors questioned about Abraham. Their statements were conflicting; two other neighbors also gave statements to the effect that they had not seen Paguira with Abraham for several years, and that she was generally known as a widow. However, according to the Administrative Decision in Abraham's case:

Information gathered from other witnesses indicates that the widow had been living openly and continuously as the wife of Pedro Paguira since the start of their relationship up to the present time. They represent themselves as husband and wife and they are known as such in their community. When they notice the rare appearance of Pedro in the claimant's premises, they opined that the reason for his actions is that Pedro and Virginia have been separated, but Pedro used to live [sic] the house very early in the morning and would be back late at night. However, Pedro would be in the claimant's house during Saturdays and Sundays. The people around know about their relationship but they are unwilling to give any deposition. Pedro was playing hide and seek with the VA field investigator. (App. 13).

Accordingly, Abraham's petition for resumption of her benefits was denied. However, the Administrative Decision contains the following inexplicable additional conclusion:

The evidence also establishes that ... de Magno knowingly conspired with and assisted Virginia Enriquez Vda. de Abraham in the presentation of false and fraudulent statements to establish her entitlement to death benefits.... It is recommended ... that this matter be presented to the Chief Attorney for forfeiture consideration. (App. 13–14).

*There is absolutely no mention of any evidence, other than de Magno's statement itself, to support such a serious allegation.* With no notification, de Magno's benefits were cut off pending investigation. Ten months later, she finally received a notification, which after summarizing the charges against her and the statement she had given, repeats the non sequitur contained in the Abraham Administrative Decision:

Your statements are false because we have credible evidence which establishes that Mrs. Abraham has been living openly and continuously as the wife of Pedro Paguira since the start of their relationship up to the present time; that they represent themselves as husband and wife and are known and reputed as such in the community in which they live. You have knowingly conspired and assisted the widow, Mrs. Abraham, in the presentation of false, fraudulent and material evidence to establish her entitlement to death benefits under PL 91–376. (App. 17).

The letter goes on to inform her that she could have a hearing–at her own expense and in Manila–but "[i]f you have no new evidence to present, either written or by witnesses, a hearing will serve no useful purpose." *Id.* The "credible evidence" referred to in the opinion is not set out; nor are the witnesses on which the VA is relying identified.

Taking the opportunity to submit written statements, de Magno protested vehemently:

... I have no intention whatsoever, nor knowingly conspired and/or assisted Mrs. Abraham, in her claim .... I have no pecuniary interest or ulterior motive in giving statements in favor of Mrs. Abraham. If the statements I gave happened to be false or not in accordance with the real facts, the same have been given by

me in good faith and should not be classified as a conspiracy or a fraudulent statement. Moreover, if the information I gave during the interview of the field examiner turned out to be incorrect or false the same were not known to me at the time of the said interview.[5] (App. 31).

A gleam of hope surfaced in a Field Examination Request issued shortly thereafter; for the first time someone in the VA seemed to recognize that a conclusion of fraudulent intent could not be based simply on de Magno's statement even if it were not "true," and that considerably more evidence was needed. After summarizing the facts, the Request states:

There is an indication that the widow–claimant [Abraham] and the cohabitant have simulated a separation and may have given some neighbors the impression that Pedro is no longer living with her. [These neighbors and de Magno] should be contacted. The following information should be obtained:

.a. How far are their respective residences from the widow.

b. How close are their personal relationships with the widow.

c. Are they in a position to know her true marital status.

d. Do they have any social contacts, if so, how often.

---

5. Along with her letter protesting the determination of fraud, de Magno submitted an affidavit from the town councilor and municipal secretary, swearing:

(1) That we know personally Marceliana B. Vda. de Magno, having been and still is, our barriomate at Guadalupe Nuevo for the last 20 years, she being a reputable resident thereof;

(2) That we know her to be a woman of high moral character, a pious woman and a respectable citizen of our barrio;

(3) That we know her to be a woman of good intentions who seldom, if ever, go out of her home, except on emergency cases, and averse to talking or gossiping falsely against her barriomates which makes us form a conclusion that she is not capable of knowingly or wittingly and/or maliciously making false statements against anybody;

(4) That considering her reputation to be beyond reproach we honestly believe that her alleged sworn statement given to a Field Investigator of the US Veterans Administration relative to the relationship of one Mrs. Virginia Vda. de Abraham and Pedro Paguira made on September 22, 1974, even if it turns out to be false, was made unintentionally, unknowingly and unmaliciously;

(5) That Marceliana B. Vda. de Magno has no intention whatsoever to conspire, aid or assist in the claim of Mrs. Virginia Vda. de Abraham for the restoration of her claim for benefit from the US Veterans Administration and that her alleged sworn statement was given to the best of her knowledge and belief without any malicious intent or ulterior motives. (App. 33).

e. Felipa Arellano Vda. de Maccay and Marcellana Bautista Vda. de Magno both stated that it seems that Virginia and Pedro have separated because they have not seen Pedro around for about three years. Felipa deposed that she does not really know what happened to their former relationship. Did this two widows and did veteran Eilvestre conspired [sic] with the widow Virginia and withheld information regarding her true marital relationship with Pedro so that Virginia can obtain dependency and indemnity compensation, or do they really do not know?

f. Did they knowingly lie about Virginia's marital status?

In order for forfeiture to lie, the false statements and evidence submitted must be knowingly and intentionally given. Please follow all leads to their logical conclusion. (App. 19–20).

A field investigation was conducted, and de Magno was interviewed again. She steadfastly asserted her innocence and good faith:

Q. Did you at the time you gave your sworn statement of September 22, 1972 knowingly and intentionally give a false statement?

A. I did not. I wish to make it clear here that when I was interviewed by the VA Field Examiner prior to his taking my statement, I told him frankly that although I was a neighbor of Mrs. Virginia Abraham, I did not know much about her life, most especially, her private life, since I was not associating with her, although it was equally true that we are neighbors. I also told the VA Field Examiner that although we were neighbors, our houses were so situated that I am unable to see what takes place inside her house when I look out of the window of this house. The VA Field Examiner told me that I had nothing to worry so long as I gave him what I knew about the subject. On the assurance by the Field Examiner, I gave him my statement of September 22, 1972. I believe that in that statement, I stated that I was not sure about the present existing relationship between Virginia Abraham and Pedro Paguira. I did not intentionally lie in that statement. At the time I gave the same, I had not seen Pedro Paguira around and so I said so in my statement. I was very reluctant to give my statement of September 22, 1972 but the VA Field Examiner assured me that I had nothing to worry, so long as I told him what I knew about the subject and all I did was tell what I honestly knew about the marital status of Mrs. Abraham.

Q. Subsequent to your giving your statement of September 22, 1972, has Mrs. Virginia Abraham talked to you to thank you for your statement of September 22 which was favorable for her claim?

A. I have not talked to her since I gave that statement of September 22, 1972.

\* \* \* \* \* \*

Q. Is it not a fact that when you gave your statement of September 22, 1972, it was your intention to favor Mrs. Abraham so that she may get back her VA benefits?

A. I had no such intentions. All I said in my statement was what I knew on the subject. I never intended to favor anyone and although I was reluctant to give a sworn statement, I was practically forced to do so, upon the assurance by the VA Field Examiner that there was nothing to worry since I was giving the information that I knew on the subject. (App. 29–30).

Apparently de Magno was convincing in person as well; when the investigator forwarded his report back to Manila, he added to copies of the depositions he had taken the comment that she "impressed me to be sincere." App. 21. The entire file was forwarded to the VA in Washington for a final decision.

The result in Washington can only be interpreted as flowing from the inertia of bureaucratic decisions already tentatively made. The final decision declaring de Magno's benefits forfeit, with no explanation or mention of new or additional evidence, merely parroted the conclusion of the initial

recommendation.[6] However, consciously or not, the decision slightly twists the facts to make its conclusion somewhat more plausible; de Magno is now charged with having sworn "that Mrs. Virginia Enriquez Vda. de Abraham had not been living in a husband–wife relationship with Pedro Paguira since about 1969."[7] App. 35. Shortly after this final decision was entered, de Magno was notified that because she had forfeited her right to benefits as of September, 1972, when she made the statement about Abraham, she now owed the United States $2,983.50, and demand for payment was made.

■ De Magno filed an administrative appeal,[8] reiterating her protest that she had only been trying to cooperate with the VA, offering in good faith her knowledge of the relationship between Abraham and Paguira. The appeals decision, however, concluded that de Magno had "beyond a reasonable doubt, knowingly submitted false evidence in a claim for restoration of death benefits," App. 54, and affirmed the forfeiture.[9]

6. Interestingly, *none* of the various decisions, in recounting the evidence in the case, mention the field investigation or the investigator's impression, as the individual listening to de Magno's version of the events, that she was sincere.

7. For the sake of contrast we set out once again what de Magno in fact said:
   Q. You talked in the past tense: Do I gather from you that Virginia and Pedro are not now engaged in their relationship as you had observed and related?
   A. It seems like it, sir, I cannot be sure.
   Q. Why are you not sure?
   A. Because it is now quite some time that I have not seen Pedro around.
   Q. How long have you not seen him around?
   A. About 3 years now, or since 1969.
   Q. Before that, did you see him often?
   A. No. Just off–and–on. (App. 10).

8. One of the reasons the VA has historically urged to justify its insulation from judicial review is that it is a "benevolent" agency, with the mission of aiding and assisting veterans in every way possible, and administers the Act in a generous and liberal way. Indeed, printed across the bottom of VA stationery is the Abraham Lincoln quotation:
   *"To care for him who shall have borne the battle, and for his widow, and his orphan."*
   On this stationery, de Magno received a response to her letter indicating her intent to appeal and requesting help concerning forms and procedures. It stated, in full:
   We have received your recent inquiry regarding the status of your claim.
   Your records have been received and will be processed in due course. You should not expect a reply for a considerable period of time.
   When a decision has been made regarding your entitlement, we will inform you.
   Do not send further letters of inquiry.
   /s/ Director Compensation and Pension Service

9. Two separate matters dealt with in de Magno's statement appear to be regarded by the VA as the "false statements" constituting fraud. One was that it "seemed" to her, though she could not be sure, that Abraham and Paguira were no longer living together, because she had not seen Paguira around for some time. There is *no* evidence in this record, *see* note 4, *supra*, that in fact de Magno *had* seen Paguira or knew he was living in Abraham's home; indeed, what evidence there is suggests that the two were attempting to simulate a separation, which, it seems, could mislead neighbors as well as the VA. In any event, de Magno's statement was carefully qualified to make it clear that what she had to say about the couple was only an opinion; as a general rule, a statement of opinion cannot constitute fraud, except in unusual circumstances not present here, as when an expert or fiduciary states an opinion on which the listener can be expected to rely. *Day v. Avey*, 548 F.2d 1018 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977).

The other statement is that Abraham was "known as a widow of a soldier who had an affair with a man." Apparently there were conflicting statements (nowhere set out in any of the administrative decisions) to the effect that in fact the community knew the couple as husband and wife. Not only is there absolutely no evidence of scienter, but the two statements are not even necessarily inconsistent. It is perfectly possible that de Magno and her circle of friends and neighbors were fully aware that in fact the couple were not married, while others, perhaps more recent residents, believed that the two were married. In spite of the speed with which it travels, gossip does not necessarily reach every resident of even a small town. Furthermore, while some people may regard any couple who live together as husband and wife without regard to legal technicalities, others, more rigorous with regard to the niceties of law and morals, may refuse to consider or refer to such a couple as anything more than "having an illicit affair." There is certainly no support anywhere in this record that de Magno was deliberately trying to mislead the VA in communicating this view of the relationship between Abraham and Paguira.

De Magno was still receiving her monthly insurance payments; these are a contractual benefit rather than "gratuitous," and cannot be declared forfeit as can other VA benefits.[10] However, it did not take the VA long to add insult to injury; it promptly notified de Magno that since she had not paid her "debt" of $2983.50, her monthly insurance check (approximately $14.00) would be withheld as a set–off until the entire debt was satisfied.[11]

She finally turned to the courts for relief, seeking to have the forfeiture removed and her insurance benefits resumed. The Government moved to dismiss the complaint, alleging that the court lacked subject matter jurisdiction because any review of the propriety of the forfeiture decision or the decision to set–off her insurance benefits based on the debt created by the forfeiture decision was barred by 38 U.S.C. § 211(a), which provides:

[T]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

The district court was "of the view that there [were] serious problems with respect to the VA's application of the forfeiture statute," but "with considerable reluc-

tance," agreed with the Government that it lacked jurisdiction, over both the underlying forfeiture decision and the decision to offset insurance benefits, and granted the government's motion to dismiss.[12] App. 68. This appeal followed.

## THE DISTRICT COURT'S JURISDICTION

■ We begin our consideration of the jurisdictional basis for this suit with the observation that in areas where Congress has limited judicial review over questions which are within the normal competence of courts, those jurisdictional limitations are interpreted narrowly, with an eye both to avoiding potential constitutional difficulties, and to preserving the Courts' traditional role of deciding legal disputes. It will not lightly be assumed that Congress meant to exclude the third branch of Government entirely from its constitutional role. We proceed from a "basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967), and will interpret a statute as wholly precluding judicial consideration of an issue only with "clear and convincing evidence of an intent to withhold it." *Id.* at 140 n. 2, 87 S.Ct. at 1511 n. 2.

■ We need look no further than the Veterans' Act itself to find a jurisdictional

---

**10.** The VA draws a distinction between so–called "gratuitous" benefits, which include widows' death compensation, dependents' compensation and indemnity compensation among others, which are forfeitable, and are not subject to judicial review, and "contractual" insurance benefits, which the veterans pay for, which are not forfeitable, and which are subject to judicial review. A historical reason for upholding the section 211(a) ban on judicial review with regard to the former was that as the benefits were "gratuitous," a gift from the Government, the Government could establish any procedures—or lack of procedures—it pleased with respect to them. *See Van Horne v. Hines*, 122 F.2d 207 (D.C. Cir.), *cert. denied*, 314 U.S. 689, 62 S.Ct. 360, 86 L.Ed. 552 (1969). The validity of this analysis today is questionable, as the gratuity/right distinction has been abandoned

in due process analysis. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). For convenience sake, however, and because we do not reach the due process issue, *see* note 13 *infra*, we use the VA's terminology here.

Section 3503, *supra* note 3, specifically exempts insurance benefits from forfeiture.

**11.** This would take approximately seventeen years.

**12.** The district court was particularly disturbed by the fact that the alleged fraudulent statement had nothing to do with de Magno's *own* right to benefits. That issue has not been pursued on appeal; the focus has been on the threshold issue of jurisdiction, and we therefore express no opinion on the point.

base for this suit.[13] While for purposes of this opinion, we will assume that suits challenging decisions concerning gratuitous VA benefits may be barred by section 211(a), Congress has specifically granted the district courts jurisdiction to hear cases relating to contractual NSLI life insurance benefits. 38 U.S.C. § 784 provides:

> (a) In the event of disagreement as to claim, including claim for refund of premiums, under contract of National Service Life Insurance, United States Government Life insurance, or yearly renewable term insurance between the Veterans' Administration and any person or persons claiming thereunder an action on the claim may be brought against the United States [in the district court] . . . and jurisdiction is conferred upon such courts to hear and determine all such controversies.

> .     .     .     .     .

> (h) The term "claim" as used in this section means any writing which uses words showing an intention to claim insurance benefits; and the term "disagreement" means a denial of the claim, after consideration on its merits, by the Administrator . . . .

The VA raises two objections to the district court's exercise of jurisdiction over the merits of this case based on section 784. First, it argues that this case does not involve a "disagreement as to claim," and that sec-

tion 784 is therefore not applicable at all. And second, it argues that even if the court does have jurisdiction over de Magno's insurance claim, it extends only so far as to determine that the VA's offset has a legal basis, in that there exists an overpayment indebtedness. Section 211(a), it argues, bars any inquiry into the evidentiary basis for the forfeiture which underlies that indebtedness.[14] We reject both arguments.

## I. JURISDICTION OVER THE NSLI CLAIM

The VA argues that it does not dispute de Magno's *right* to her insurance benefits; indeed, it protests that in fact she is "receiving" her benefits as each month her debt is reduced. Since a "disagreement as to claim" is required under section 784, it argues that the court therefore lacks jurisdiction.

This position suffers from a formalistic bent which is at odds both with the statute and the intent of Congress in providing for district court jurisdiction over insurance disputes. Furthermore, it confuses claims with defenses. All that is necessary to give a district court jurisdiction over a suit involving insurance benefits is for a claimant to notify the VA of his or her "intention to claim insurance benefits" and for the VA to refuse to pay the claim. The statute in no way limits jurisdiction to denials that are based on particular reasons. Here, de Mag-

---

**13.** In spite of the fact that the issue is squarely raised, and granting review only of de Magno's right to receive insurance benefits will not afford her complete relief, we have concluded that for the time being it is the wiser course for us to avoid ruling on the question whether section 211 bars a direct constitutional challenge to a forfeiture decision under the facts of this case. We regard the question as extraordinarily difficult, touching on the most basic questions of the constitutional role of the courts in the separation of powers, and even in the VA context it is a question which may well be rendered moot in the near future; the Senate has already passed a thorough–going reform of the procedural portions of the Veterans' Act, making specific and extensive provision for judicial review. S. 330, discussed and passed by the Senate, 96th Cong., 1st Sess., 125 Cong.Rec. S12698–S12721 (daily ed. Sept. 17, 1979).

In this case the same underlying factual question as would need be resolved if the forfeiture proceeding were to be attacked directly, the propriety of the VA's determination of de Magno's intent to commit fraud in the course of giving her statement, will be resolved in determining de Magno's right to insurance benefits. We will assume that the administrative processes are capable of remedying any remaining injustices resulting from any finding of de Magno's lack of fraudulent intent without the coercion of the court.

**14.** The VA makes the final argument that even if we are to conclude that the district court was in error in dismissing for lack of jurisdiction, it is still entitled to summary judgment on the present record. We believe that our description of the facts and note 9, *supra*, adequately dispose of this argument.

no wrote a letter objecting to the termination of her insurance benefits and demanding that they be resumed. The VA denied her claim, responding that they could not be resumed until her "debt" was satisfied.

The legislative history of the "disagreement as to claim" language indicates that Congress intended a claimant to have the same access to courts and judicial remedies as would exist were the NSLI policy issued by a private insurance company. The phrase was intended only to require that the plaintiff exhaust administrative remedies before turning to the courts for relief.

According to the Senate Report, "[i]t has for its purpose the establishment of a definite rule that before suit is brought a claimant must make a claim for insurance and prosecute his case on appeal through the appellate agencies of the bureau before he shall have the right to enter suit." S.Rep. No. 1128, 71st Cong., 2d Sess. 2–3 (1930).

We conclude that section 784 provides for jurisdiction over de Magno's claim to the extent that she seeks recovery of withheld NSLI benefits and resumption of her monthly insurance payments.[15] On its face,

---

**15.** The VA contends that this interpretation of section 784 is foreclosed by this court's decision in *Whittier v. Emmet*, 281 F.2d 24 (D.C. Cir. 1960), *cert. denied*, 364 U.S. 935, 81 S.Ct. 380, 5 L.Ed.2d 367 (1961). The case arises out of a complicated history which we must explain in some detail in order to clarify why we do not regard the opinion as controlling our decision here. Under the Soldiers' and Sailors' Civil Relief Act of 1940, the United States guaranteed the payment of premiums on commercial life insurance carried by the servicemen. In 1942, the statute was amended to provide that when the United States actually was called upon to pay such premiums, it created a debt due the United States, collectible from amounts due the servicemen. The VA interpreted the 1942 amendment as creating by implication a comparable repayment requirement for premiums which had been paid *before* the amendment was passed, and proceeded to recover the resulting "debts" from thousands of insured servicemen. Some of the collections were made by offset against various benefits payable to the servicemen, including NSLI dividends, some were paid by the servicemen in response to demand by letter, and some were collected through judicial proceedings.

The Supreme Court then held, contrary to the position taken by the VA, that insured servicemen were *not* obligated to reimburse the Government for premium payments made prior to the 1942 Amendment. To facilitate the refunding of the wrongfully withheld funds, Congress passed a statute authorizing the payment of refunds and providing that no "technical defenses" were to· be relied upon to deny the right to refund. *Whittier* was a suit to recover refunds, interest and attorney's fees. The plaintiffs asserted jurisdiction based upon both the Tucker Act, 28 U.S.C. § 1346(a)(2), and section 784.

In discussing whether venue had been proper in the district court based on section 784, this court decided that it had not, for three reasons. First, the plaintiffs had not filed a claim and received a denial from the VA, and second, the suit concerned set–offs against insurance *divi-*

*dends* resulting from lower–than–anticipated ·operating costs, rather than contractual benefits arising from liability on the contract. Finally, the court stated that the suit sought to recover collections made under the Soldiers' and Sailors' Civil Relief Act, not benefits due under the NSLI Act:

> The cases before us do not involve any disagreement about dividends under the Insurance Act. The Government admits the plaintiffs' right to those dividends. It disbursed them from the Insurance Funds and credited plaintiffs' accounts by offsetting the erroneous claims of the Government under the Soldiers' and Sailors' Civil Relief Act.

*Id.* at 30. We do not regard *Whittier* as foreclosing our finding jurisdiction based on section 784. First of all, the remarks were dicta; the only argument raised went to the propriety of venue, not jurisdiction, and although the court concluded that venue had not been proper, it went on to consider the appeal on the merits because improper venue is waived if it is not raised before the district court. Furthermore, the comment relied upon by the Government was only one of three reasons offered for the conclusion that section 784 did not apply. Finally, the comment by the court must be read in the context of the facts of the case; not only did the Government deny that there was any dispute over the plaintiffs' entitlement to dividends but it did not dispute the plaintiffs' right to a refund. The only dispute in the case was over attorney's fees and interest. Thus the court was accurate in concluding that there was no "disagreement as to claim" under the life insurance contracts.

Here in contrast, de Magno has brought suit asserting that the VA is in breach of its contractual duty to pay her life insurance benefits every month. The VA denies that there is a breach of contract, asserting as a defense the argument that de Magno owes the Government a debt, against which the benefits are being credited. We believe that on its face this is a "disagreement as to claim," under an NSLI contract and that section 784 provides for jurisdiction in the district court.

de Magno's complaint asserts a disagreement with the VA as to her claim to payment of insurance benefits, and she has pursued her claim through administrative channels. Section 784 requires no more.

## II. JURISDICTION TO EXAMINE THE EVIDENTIARY BASIS OF THE FORFEITURE DECISION

■ The Government's second argument is that even if the district court has jurisdiction over the NSLI claim, the court's scope of inquiry is limited to determining that in fact the forfeiture decision was entered, creating a "debt" and providing a basis for the decision to assert a set–off. It contends that any further inquiry into the evidentiary basis for the forfeiture decision is barred by section 211.

We cannot agree that this was the intent of Congress when section 211 was passed, and we are bolstered in that conclusion by a decision by the Second Circuit, directly on point, which holds that "where the Government seeks a set–off or other affirmative relief it cannot rely on the 'no–review clause' of Section 211(a) to support its own claims." *DiSilvestro v. United States*, 405 F.2d 150, 155 (2d Cir. 1968). DiSilvestro had been receiving veterans' disability benefits, but the VA subsequently decided that certain entries in his medical records had been falsified. It declared his disability benefits forfeit, and in order to recoup the benefits which had already been paid, withheld payment of his NSLI dividends as a set–off. In DiSilvestro's action seeking payment of the withheld dividends, the court held that while section 211(a) served to shield VA determinations concerning

gratuitous benefits from direct challenge, it could not be turned around by the VA to be used as a sword when it took affirmative action against an individual. Therefore, the court held, the district court had jurisdiction to examine the evidentiary basis for the set–off to assure that it was reasonable and supported by substantial evidence.[16]

We find this result to be wholly consistent with congressional intent in adopting section 211(a), perhaps the only result consistent with due process, and fully supported by ordinary jurisdictional principles. It is not at all unusual for a court to find it necessary in the course of deciding a dispute over which it does have jurisdiction to decide an issue which would be outside its jurisdiction if raised directly. For example, in deciding a conversion action, a court may have to determine title to property in another state, a question which it would have no competence to decide directly. Or in a contract action in state court, the court may find it necessary to decide the merits of the defendant's position that the contract was in violation of the federal antitrust laws, an issue which is within the exclusive jurisdiction of the federal courts if raised directly. While a court's lack of jurisdiction to decide an issue directly may affect the collateral estoppel effect of the particular factual determination, *see, e. g., Lyons v. Westinghouse Electric Corp.*, 222 F.2d 184, 188 (2d Cir.), *cert. denied sub nom. Walsh v. Lyons*, 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955), it does not limit the court's power to decide the question to the extent it is relevant to the dispute over which it does have jurisdiction. As Mr. Justice Holmes pointed out in a case involving a state court's incidental determination of the validity of a patent agreement:

16. Other decisions concluding that section 211(a) does not render the VA's decisions to recover alleged debts by suit or offset unreviewable include *United States v. Gibson*, 207 F.2d 161, 163 (9th Cir. 1953), *vacated on other grounds*, 225 F.2d 807 (9th Cir. 1955); *Gongora v. United States*, 183 F.Supp. 872, 873 (D.D.C. 1960) (Holtzoff, J., stating that the "finality provisions may be used as a shield, but not as a sword"); *United States v. Owens*, 147 F.Supp. 309, 313–15 (E.D.Ark.1957) (rejecting the Government's position on the ground that it "would make the courts but rubber stamps for

administrative action ... serving no function but to render judgments preliminary to the issuance of execution thereon"); *United States v. Lawrence*, 154 F.Supp. 454 (D.Mont.1957); *Hormel v. United States*, 123 F.Supp. 806, 809–10 (S.D.N.Y.1954); *Morton v. United States*, 113 F.Supp. 496 (E.D.N.Y.1953); *see Colorado v. Veterans Administration*, 430 F.Supp. 551 (D.Colo.1977), *aff'd*, 602 F.2d 926 (10th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980). We do not agree with those decisions suggesting the opposite.

Establishing a fact and giving a specific effect to it by judgment are quite distinct.... That decrees validating or invalidating patents belong to the Courts of the United States does not give sacrosanctity to facts that may be conclusive upon the question in issue. A fact is not prevented from being proved in any case in which it is material, by the suggestion that if it is true an important patent is void ....

*Becher v. Contoure Laboratories, Inc.,* 279 U.S. 388, 391–92, 49 S.Ct. 356, 357, 73 L.Ed. 752 (1929).

Furthermore, a conclusion that Congress intended section 211(a) to bar consideration of the validity of the VA's determinations even when used by that agency as the basis for affirmative action against an individual's admitted property interests would raise serious constitutional problems. Not only would this theory, in effect, allow the VA to function as its own independent judge, jury and police force, determining first whether it has been the victim of a fraud and then setting out to remedy its own damages free of judicial interference, but carried to its logical conclusion, this interpretation of the statute would permit the VA to enlist the coercive power of the courts to enforce a money judgment against an individual without the basis of the VA's claim ever being subject to judicial scrutiny.

Such "self–help" on the part of an administrative agency runs into substantial due process problems, and is contrary to the very notion of an ordered government of checks and balances; we would not lightly conclude that Congress intended to grant the VA such power. It is one thing for an agency to have the final say over whether an individual will continue to receive a gratuitous governmental benefit; it is quite another for it to assert a right to use the coercive power of the government to seize and convert to its own use an individual's property without any possibility of judicial review.[17]

We can find no hint in the statute or legislative history that Congress intended such a novel—and questionable—result, and we agree with the *DiSilvestro* decision that no such result was intended. But the VA argues and the District Court held, that the analysis in *DiSilvestro* did not survive the 1970 amendments to section 211(a), which served to strengthen the barrier to judicial review.

We cannot agree with this view of the 1970 amendments; the decision and its analysis is nowhere mentioned in the legislative history, though many other cases raising different problems are; and the changes that were made in the former section 211(a) do not affect the *DiSilvestro* theory in the least.[18] To the extent that

---

**17.** Both Professor Hart and Professor Jaffe have suggested that such a result would be unconstitutional:

> We can then conclude that, when a person is the object of an administrative order which will be enforced by a writ levying upon his property or person, he is at some point entitled to a judicial test of legality.

L. Jaffe, Judicial Control of Administrative Action, 384 (1965) (italics omitted). In his famous *Dialective*, Professor Hart poses the question:

> Suppose Congress authorizes a program of direct action by Government officials against private persons or private property. Suppose, further, that it not only dispenses with judicial enforcement but either limits the jurisdiction of the federal courts to inquire into what the officials do or denies it altogether.

Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362, 1387 (1953). Professor Hart goes on to suggest that the answer is that the court should examine the Govern-

ment's action on the merits, and if it is invalid to declare the jurisdictional limitation invalid and proceed under its general grant of jurisdiction.

**18.** Prior to 1970, section 211(a) provided that VA decisions

> on any question of law or fact concerning a claim for benefits or payments under any law administered by the Veterans' Administration shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision.

In a series of decisions by this court, in the context of particularly compelling facts (one VA decision had terminated a veteran's benefits because required documents had not been submitted; the veteran was institutionalized in a mental institution at the time), the section was interpreted to apply only to VA decisions concerning *initial* "claims" for benefits; later

the decision was a sound analysis of section 211(a) when it was decided, it remains so today.

Nor would the VA's interpretation advance the purposes of section 211(a). In a decision holding that section 211(a) was no denial of veterans' benefits to conscientious objectors who perform alternative civilian service, the Supreme Court identified the purposes of section 211(a) as:

> (1) to insure that veterans' benefits claims will not burden the courts and the Veterans' Administration with expensive and time–consuming litigation, and (2) to insure that the technical and complex determinations and applications of Veterans' Administration policy connected with veterans' benefits decisions will be adequately and uniformly made.

*Johnson v. Robison*, 415 U.S. 361, 370, 94 S.Ct. 1160, 1167, 39 L.Ed.2d 389 (1974). The VA renders thousands of routine determinations annually; full–scale judicial review

termination decisions were open for judicial review. *See Tracy v. Gleason*, 379 F.2d 469 (D.C. Cir. 1967); *Thompson v. Gleason*, 317 F.2d 901 (D.C. Cir. 1962); *Wellman v. Whittier*, 259 F.2d 163 (D.C. Cir. 1958).

The 1970 amendments were specifically intended to eliminate this distinction and to eliminate the foundation for this line of cases. Congress believed it unfair to grant review of terminations but not initial denials, and moreover concluded that the theory would swamp the courts with review of technical determinations made by the VA. Cases were being brought based on terminations during the 1930s as there was no applicable statute of limitations. Congress therefore changed the phrase "decisions ... concerning a claim for benefits" to "decisions ... under any law ... providing benefits."

This change, and the concerns being addressed by Congress in making the amendments, do not affect the analysis of *DiSilvestro* in the least. Unlike the series of judicial review decisions in this court, *DiSilvestro* was not based upon an interpretation of the phrase "claim for benefits," has procedural limitations built in it through section 784, and as discussed in more detail in text, does not undercut the two main concerns of Congress in passing the 1970 amendments. Nor would it be "unfair" to conclude that persons who were not only losing their gratuitous benefits but also suffering the seizure of their property in satisfaction of an alleged debt should have the right to judicial scrutiny of the basis for that debt.

would indeed add substantially to the work of the courts, and many of the VA's determinations involve technical medical inquiries. If either of these legislative purposes would be frustrated by our holding that the courts have jurisdiction over this case we would approach this decision with more pause.

We have no figures on how often the VA seeks forfeiture today, but even in 1958, before Congress removed the VA's power to declare a forfeiture whenever the recipient resides in the United States,[19] leaving the remedy as a possibility only with respect to overseas recipients, forfeiture was decreed in only 303 cases, hardly a number to overwhelm the judicial system. House Report at 2. The number of cases in which the VA decides to move against a recipient to recover benefits it believes were wrongfully paid must be even less, as the paucity of precedent would suggest. Finally, and par-

19. One of the ironies of this case is that in 1959 Congress almost completely withdrew the power of the VA to declare forfeitures. In reports extremely critical of the VA forfeiture scheme, and including case histories of forfeitures which the Congress obviously considered unwarranted, both the Senate and the House emphasized that there were entirely adequate penalties for fraud available under the criminal laws, that forfeiture decisions of the VA had been arbitrary and inequitable, that no other federal program included such a penalty, and that forfeiture of veterans' benefits was inherently unfair because of the wide variation in amounts of benefits which would be declared forfeit. H.R.Rep. No. 420, 86th Cong., 1st Sess. (1959) (hereinafter House Report); S.Rep. No. 664, 86th Cong., 1st Sess. (1959). In this case, for instance, de Magno was entitled to hundreds of dollars of monthly benefits for the rest of her life when the forfeiture decision was issued, while Abraham (for whose benefit the alleged fraud was purportedly committed) was entitled to no benefits at all because of her continuing relationship with Paguira, and thus lost nothing.

The penalty was retained only for recipients of benefits residing overseas and beyond the reach of our criminal laws. Thus, any domestic recipient not only escapes forfeiture for alleged fraud, but in determining whether a fraud occurred is entitled to all the procedural protections of our criminal justice system. The "safeguards" afforded de Magno are adequately described in our statement of the facts.

ticularly in the case of forfeiture, these issues are within the peculiar expertise of the courts, not the agency. Fraud and deceit are, unfortunately, questions which the courts must consider regularly, and we are well–acquainted both with the elements of the offense and the evidentiary standards which govern its determination. Indeed, problems with the agency's attempts to administer the forfeiture provisions, together with the feeling that standard criminal penalties were sufficient punishment and deterrence for fraud, led to the withdrawal of the agency's power to declare forfeitures in domestic cases in 1959, as the House Report makes clear:

> More than a hundred cases in which forfeiture had been considered by the Veterans' Administration were examined by the committee. In addition to problems involved in the basic philosophy of forfeiture the committee found the administration of the program was not uniform and created inequitable results. Consideration of forfeiture seemed to depend upon chance so that some cases were forfeited where many other instances of identical misrepresentation were not considered. Until recently there had not been any standard adopted for testing the materiality of a statement so that in many instances forfeiture was adjudged where the false statement had no bearing on entitlement of the benefit. In most instances the accused was not accurately informed of the charges against him and in other cases the Veterans' Administration was in possession of the true facts so they were not misled by the misrepresentation.

House Report at 4.

In sum, we have determined that the question of whether section 211(a) would–or should–bar a court's inquiry in a case such as this one was never addressed or considered by Congress, either when the predecessor to section 211(a) was first adopted or upon its amendment in 1970. Furthermore, the purposes of the section, as identified by the Supreme Court, would not be served by extending the section 211(a) bar to this situation. Finally, such a construction of the provision would pose serious constitutional questions, forcing us to explore questions which we would prefer to avoid absent the clearest indication that such was the intent of Congress. We conclude that when the VA takes affirmative action against an individual whether by bringing an action to recover on an asserted claim or by proceeding on its common–law right of set–off, the validity of the underlying basis of the action becomes open to judicial scrutiny. We therefore reverse the decision of the district court and remand the case for further proceedings consistent with this opinion.