**NATIONAL AIRMOTIVE CORPORATION,**
**Plaintiff,**

v.

**The GOVERNMENT AND STATE OF IRAN et al., Defendants.**

**Civ. A. No. 80–0711.**

United States District Court,
District of Columbia.

Oct. 16, 1980.

---

John T. Behrendt, William R. Hyde, Jr., Gibson, Dunn & Crutcher, Los Angeles, Cal., for plaintiff.

Thomas G. Shack, Jr., Abourezk, Shack & Mendenhall, P.C., Washington, D. C., for defendants.

R. Craig Lawrence, Asst. U. S. Atty., Washington, D. C., suggestion of interest.

## OPINION

HAROLD H. GREENE, District Judge.

This is an action to recover a debt allegedly due and owing to plaintiff, an American corporation, by defendants, the government and state of Iran and agencies and instrumentalities thereof, pursuant to certain contractual agreements. Contemporaneously with the filing of its complaint,

plaintiff filed an application for writ of attachment before judgment as to certain property of defendants frozen in this country and now in possession of agencies or instrumentalities of the United States pursuant to Executive Order No. 12170. The Court signed an order approving the issuance of such writ on March 21, 1980. Presently pending before the Court in this action are a motion to quash this attachment by garnishees Department of Defense, Department of Treasury, and Defense Security Assistance Agency; and a motion to dismiss by defendants on grounds of lack of subject matter and personal jurisdiction, improper venue, and insufficiency of service of process, both filed in the month of July.

On August 13, 1980, a Suggestion of Interest was filed on behalf of the United States requesting that the Court stay all proceedings in the instant action for an indefinite period.[1] Accompanying the pleading was an affidavit by the Secretary of the Treasury G. William Miller which describes certain foreign policy concerns which allegedly support the government's request for a stay. Subsequently, in response to the government's offer, the Court also examined *in camera* classified declarations of Secretary Miller and Deputy Secretary of State Warren M. Christopher elaborating on those concerns.[2] Having examined these documents, as well as all the pleadings submitted by the parties,[3] the Court has concluded that a stay of the proceedings for an indefinite duration, as requested by the United States, cannot be justified.

The government presents two basic arguments in favor of a stay. First, it is said that certain Treasury regulations prohibit the Court from proceeding further with the case; second, they appeal to the Court's equitable powers which, it is claimed, should be exercised because of what the government regards as the foreign policy implications of further proceedings herein.

### I

The Iranian Assets Control Regulations (31 C.F.R. Part 535)[4] provide in section 201(a) that

No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which ... Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized.

---

**1.** Similar Suggestions have been filed in other private actions brought against the State of Iran or its instrumentalities throughout the country. In at least one of those actions, the government's motion for a stay was denied by the District Court. See *New England Merchants National Bank v. Iran Power Generation and Transmission Co. et al.,* 495 F.Supp. 73, (S.D.N.Y.1980).

**2.** While the *in camera* documents elaborate somewhat on the Miller affidavit they do not present different or more concrete facts.

**3.** Plaintiff takes the position that the stay should be denied primarily because Treasury Regulations issued pursuant to the International Emergency Economic Powers Act, see note 4, *infra*, specifically permit the filing and prosecution of lawsuits against the government of Iran and its instrumentalities to the point of entry of judgment, and because denial to private litigants of access to the courts in the fashion suggested by the United States lies outside the statutory and constitutional authority of the Executive Branch. Defendants simply argue that a judgment on a motion to dismiss does not constitute a judgment within the terms of the Treasury Regulations cited by the government.

**4.** These regulations were promulgated by the Department of the Treasury pursuant to Executive Order No. 12170 of November 14, 1979, blocking all property and interests in property of the government of Iran. This Executive Order was issued, in turn, pursuant to authority vested in the President by the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.,* section 1702(a)(1)(B) of which authorizes the President to

investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country of a national thereof has any interest ... by any person, or with respect to any property, subject to the jurisdiction of the United States.

Under section 203(e) of the same Part, "any attachment judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property" in which Iran has an interest, "unless licensed or authorized pursuant to this part." Section 504 which was added to the regulations on November 23, 1979, purports to license judicial proceedings with regard to the Iranian assets, but subsection (b) excludes from such license

> The entry of any judgment or of any decree or order of similar or analogous effect upon any judgment book, minute book, journal or otherwise, or the docketing of any judgment in any docket book or the filing of any judgment roll or the taking of any other similar or analogous action.

■ The government argues that these regulations should be construed to halt all further proceedings herein, apparently on the theory that the prohibition on the entry of judgments encompasses all steps preliminary to such entry, and more particularly, that, as long as the regulations remain in effect, any determination of substantive legal rights is prohibited.[5] This argument flies directly in the face of the legislative history of the regulations and the judicial construction of similar regulatory pronouncements.

The summary of the November 23, 1979 amendments to the regulations, prepared by Treasury Department's Office of Foreign Assets Control, explains that "the need for [this] amendment is to *authorize* judicial proceedings to deal with a large volume of cases which are anticipated" (emphasis added). 44 Fed.Reg. 67617 (Nov. 26, 1979). In view of that unequivocal statement, it is not surprising that it has been held that section 504, far from being a device for blocking court action, appears to reflect a Treasury Department effort "to permit the full range of judicial proceedings involving Iran and its entities . . . ." *E–Systems, Inc. v. Islamic Republic of Iran*, 491 F.Supp. 1294 (N.D.Tex.1980).

This interpretation finds support in cases construing identically worded regulations, promulgated pursuant section 5(b) of the Trading with the Enemy Act, 50 App.U.S.C. § 1 *et seq.*[6] Notwithstanding 31 C.F.R. 500.504 and 515.504 which contain the same language as section 504 of Part 535, courts have proceeded with litigation pertaining to blocked assets of Vietnam and Cuba, even to the point of judgment, where the judicial processes did not involve the transfer of blocked funds. See *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964);[7] *Vishipco Line v. Chase Manhattan Bank*, 77 Civ. 1251 (S.D.N.Y., Nov. 3, 1978). The *Vishipco* case describes the extent to which section 500.-504 (identical to 535.504) limits the freedom of action of the courts:

> The objective of the regulation is to prevent circumvention of the Trading with the Enemy Act by parties who would seek a court order effectuating a transfer that would otherwise be prohibited . . . . That purpose is not frustrated by is-

---

5. The government states in this respect further that under the regulations neither party to the litigation is able to obtain a final court judgment, and that no purpose would be served therefore by legal proceedings short of judgment as long as the regulations are effective.

6. Section 5(b) contains language identical to that of section 1702(a)(1)(B) of the IEEPA, quoted in note 4, *supra.*

7. In the *Sabbatino* case (in which the Supreme Court, while not squarely addressing the issue of the effect of section 515.504 upon litigation involving frozen assets, held that the courts were not closed to a Cuban plaintiff seeking to litigate with respect to such assets) the Department of Treasury discussed the relationship between the Cuban Assets Control Regulations, 31 C.F.R. Part 515, and the progress of the litigation in the following language:

> In the event of a judgment in favor of petitioner Banco Nacional, in this case these Regulations would prohibit the execution or other enforcement of such judgment. However, in the view of the Treasury the Regulations impose no barrier to the continuation of the litigation in this case, nor the entry of a judgment for the petitioner.

Brief for the United States as Amicus Curiae, p. 33, n. 31, quoted in Goodman, United States Government Foreign Property Controls, 52 Geo.L.J. 767, 798 (1964).

suance of a judgment that does not transfer title or require immediate payment out of blocked funds.

See also *Zittman v. McGrath*, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951). Thus, prior constructions of regulations identical to those at issue in the present case not only have established that the regulations do not require litigation concerning frozen assets to be stayed; they go so far as to suggest that judgment may be entered, at least as long as a transfer of blocked assets is not entailed.[8]

The conclusion that the regulations do not create a barrier to further proceedings is further supported by the familiar canon that a construction involving unconstitutionality is to be avoided if at all possible, *United States v. Vuitch*, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *International Union v. National Right to Work Legal Defense and Ed. Foundation, Inc.*, 590 F.2d 1139 (D.C.Cir.1978).

It is clear that were the Court to accept the government's interpretation, the gravest constitutional difficulties would arise. A bar on judicial consideration of plaintiff's claims on the basis proposed by the government would legitimize an attempt on the part of the Executive Branch, through Treasury regulations, to limit the jurisdiction of the federal courts. Whether Congress itself could restrict federal court jurisdiction by statute remains an unanswered question of the type that the courts are

reluctant to explore "absent the clearest indication that such was the intent of Congress." *DeMagno v. United States,* 636 F.2d 714 at ——, (D.C.Cir. 1980). Whatever may be the authority of the Congress in this regard, it has rarely, if ever, been suggested that an Executive agency may, by regulation, bar the courts from operating with respect to particular subject matters. The constitutional difficulties that would be raised by an attempt to impose such a bar are too numerous to catalogue or explore here.

There is no need for such an exploration. Neither the underlying statute nor the regulations evidence an intent to have the Treasury Department encroach upon the jurisdiction of the federal courts. Since the regulations on their face purport to authorize rather than to prohibit the continuation of litigation concerning Iranian assets to judgment,[9] it is not necessary to reach the question of whether such a prohibition would be constitutional. The Court holds that the regulations in and of themselves are not a bar to further proceedings in this case.

## II

The second phase of the government's argument is addressed to the Court's equitable power to stay its proceedings. There can be no doubt about the existence of such a power. *Landis v. North America Corp.*, 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1948). It is equally clear, however,

8. In the present action, the only pending dispositive motion is defendants' motion to dismiss. No matter how the Court rules on that motion, a transfer of blocked funds would not be involved.

9. It is doubtful that the barring of the entry of judgment would be constitutionally valid. The government argues in favor of validity on the theory that the regulation providing for such a prohibition was ratified by Congress when it reenacted section 5(b) of the TWEA as section 1702(a)(1)(B) of the IEEPA. Not only does that argument fail to address the fundamental question of the Congress' power so to limit the power of the Judicial Branch, but it also ignores the judicial constructions of the "ratified" regulations under the Trading with the

Enemy Act discussed above. If Congress can be said to have ratified regulations under a statute by reenacting the statute, surely it can be deemed to have ratified also contemporaneous judicial interpretations of those regulations. It is not necessary fully to address this question at this time, since the only motion pending is one to dismiss on the grounds of lack of subject matter jurisdiction. A judgment either way on this motion would not have the effect of transferring rights in blocked property as prohibited in section 535.201(a) of the regulations. "Transfer" is defined in section 535.310 as "create, surrender, release, transfer or alter" any interest in Iranian property under U.S. jurisdiction.

that, in exercising its stay authority, a court "must weigh competing interests and maintain an even balance," and further, that it would be an abuse to grant a "stay of indefinite duration in absence of pressing need." 299 U.S. at 254–55, 57 S.Ct. at 165–66. It is against these standards that the government's application must be measured.

■ The government argues initially that, because of the current problems of the United States with Iran, it would be prevented from furnishing to the Court its views on the sovereign immunity defense asserted by Iran in its motion to dismiss. It is difficult to see how this constitutes a "pressing need," especially given the enactment by the Congress of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. A primary purpose of that Act was to depoliticize sovereign immunity decisions by transferring them from the Executive to the Judicial Branch of government, thereby assuring litigants that such decisions would be made on legal rather than political grounds. *Jet Line Services, Inc. v. M/V Marso El Hariga,* 462 F.Supp. 1165, 1170 (D.Md.1978). As a matter of law it, therefore, cannot be deemed crucial whether or not the United States offers its views on that aspect of the case. If, for whatever reason, the government feels unable to present its views, the issue will be decided by the Court without their benefit, as has been done by other courts in similar circumstances. See *e. g., American International Group, Inc. v. Islamic Republic of Iran,* 493 F.Supp. 522 (D.D.C.1980); *Electronic Data Systems Corp. v. Social Security Organization of Iran,* Civil Action No. A3–79–218–F (N.D.Tex. May 2, 1980).

■ The government claims further that court proceedings involving Iranian assets might restrict the President's flexibility in finding means to resolve the crisis in Iranian–American relations, that Iranian assets are a bargaining chip that should be preserved, and that a pronouncement by an American court with respect thereto may be perceived by the Iranian authorities as reflecting the policies of the United States.

All of these contentions would be highly persuasive if they were not open–ended as to substance and particularly as to duration. But the government's pleadings and its classified and unclassified affidavits do not indicate with the slightest degree of specificity that discussions to resolve the Iranian crisis are taking or are about to take place, in what way judicial proceedings involving Iranian assets not accompanied by a direct transfer of funds[10] would harm those discussions, or when in the future a stay on judicial proceedings might be lifted.

The Court is, of course, most sympathetic to the government's position, particularly as it may relate to the American hostages. But a mere general desire to maintain flexibility for an indefinite period toward the day when, possibly, the assets may become a diplomatic bargaining chip[11] is inadequate when weighed, as it must be under *Landis,* against competing interests. Those interests are represented here by the very specific and present right of an American plaintiff to access to the American courts to vindicate its claims to property located on American soil–a right stemming directly from Article III of the Constitution and the Fifth Amendment.

■ The factors upon which the government relies would obviously not be sufficient to sustain a suspension of constitutional rights other than those here presented.

10. No transfer of Iranian assets is involved at this stage of the proceedings. Iran's motion to dismiss is pending and may be granted; judgment in favor of plaintiff is not assured even if the motion is to be denied; and the Treasury Regulations (assuming *arguendo* their validity (see *Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir. 1966))) appear to stand in the way of an actual transfer of funds. Finally, the United States always retains the option of spending tax funds in pursuit of its foreign policy objectives, as distinguished from private funds or claims to private funds where its authority is much more limited.

11. An immobilization of the judicial system through the grant of an indefinite stay under these circumstances would simply add the American system of law and justice to the hostage rolls.

For example, the press could not, consistently with the First Amendment, be prohibited from publishing the news or commenting thereon on the ground that this was desirable in order to preserve diplomatic flexibility or to avoid incurring the displeasure of a foreign regime. See *International Products Corp. v. Koons*, 325 F.2d 403 (2d Cir. 1963). Likewise, the courts would not be justified in depriving individuals of their liberty to assist the government in achieving its foreign policy objectives.[12]

■ The action the government has proposed is different only in degree. The plaintiff has a constitutional right to access to the courts for an adjudication of its claims with respect to what are alleged to be property interests. While—unlike the rights to liberty and freedom of speech—enjoyment of that right may be delayed in appropriate circumstances, it may not be denied entirely. Yet an indefinite stay of the proceedings on the basis of the relatively vague representations made by the government would amount to just such a denial.

### III

■ On September 26, 1980, the Court of Appeals for this Circuit granted a ninety-day stay of proceedings in *American International Group, Inc. v. Islamic Republic of Iran, et al.*, No. 80–1779 in response to a Suggestion of Interest filed by the United States similar to that filed in this case. While the decision of the Court of Appeals technically does not bind this Court in the instant case, it does represent an appellate ruling in this Circuit on a pleading that is all but identical to the one filed by the government here.[13] Moreover, the appellate stay does not represent the indefinite suspension of proceedings sought by the government. It is, rather, severely limited in duration.

In deference to the ruling of the Court of Appeals, the Court will stay the proceedings herein to the date upon which the appellate stay expires in December, that is, for a period of seventy days from this date. Should the Court of Appeals extend its stay in December, the Court will consider applications from either party or from the United States for a similar extension.

---

12. Thus, opponents of a foreign regime or those engaged in demonstrations against it could not be jailed on that account even if such an action would assist American foreign policy.

13. It should be noted, however, that *American International Group, Inc.* is before the Court of Appeals and was before the District Court in a very different procedural posture than in the instant action. Pending before this Court in the present case is only a motion to dismiss by the defendants; argued before Judge Hart in *American International Group, Inc.* were motions for preliminary injunction and partial summary judgment by plaintiff. Judge Hart granted plaintiff the injunction and entered partial summary judgment in plaintiff's favor, and defendants appealed. Thus, in the case before the Court of Appeals, a judgment on the merits has been entered of the sort that the Treasury Regulations investigation appear, on their face, to prohibit. No party has moved for such a judgment in the instant case.