**NATIONAL OIL CORPORATION, Petitioner,**

v.

**LIBYAN SUN OIL COMPANY, Respondent.**

**Civ. A. No. 89–415–JLL.**

United States District Court, D. Delaware.

March 15, 1990.

---

Arthur G. Connolly, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, Del., Joseph D. Pizzurro, George Kahale III, and Michelle A. Rice of Curtis, Mallet–Prevost, Colt & Mosle, New York City, for petitioner.

H. James Conaway, Jr. and David O'Connor of Young, Conaway, Stargatt & Taylor, Wilmington, Del., William D. Rogers, Douglas A. Dworkin, Ann E. Misback, and Erik T. Moe of Arnold & Porter, Washing-

ton, D.C., Stanley L. Arabis and James S. Godderz, Radnor, Pa., for respondent.

## OPINION

LATCHUM, Senior District Judge.

In this case the Court has been called upon to examine and evaluate, among other things, the legal significance of the current state of relations between Libya and the United States. The facts and arguments presented by the parties have put this Court in the unenviable and precarious position of having to place legal labels on the foreign policy maneuvers of the Bush administration. Unfortunately, the Court has no choice but to proceed.

Petitioner, National Oil Corporation ("NOC"), seeks to have this Court enter an order confirming a foreign arbitral award rendered in NOC's favor against respondent, Libyan Sun Oil Company ("Sun Oil"). (Docket Item ["D.I."] 2 at 6–7; *see* Case No. 4462/AS/JRI, *National Oil Corporation (Libya) v. Libyan Sun Oil Company, Inc. (U.S.A.)*, Exhibits B [First Award] & C [Final Award], D.I. 3.) NOC brings this action pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"), a treaty ratified by the United States and implemented through Congressional legislation. *See* 9 U.S.C. §§ 201–208 (1970). Sun Oil has moved to dismiss the petition or, in the alternative, to deny recognition of the award. (D.I. 11; D.I. 12.) This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this case arises under federal law. *See* 9 U.S.C. § 203 (West Supp.1989).[1]

## FACTUAL BACKGROUND

NOC is a corporation organized under the laws of the Socialist People's Libyan Arab Jamahiriya ("Libya"), and wholly owned by the Libyan Government. (D.I. 3 at 2.) Sun Oil is a Delaware corporation and a subsidiary of Sun Company, Inc. (*See* D.I. 12 at 1.) The dispute currently before the Court stems from an Exploration and Production Sharing Agreement ("EPSA") entered into by the parties on November 20, 1980. (*See* EPSA, Annex 1, Exhibit A, D.I. 3.) The EPSA provided, *inter alia*, that Sun Oil was to carry out and fund an oil exploration program in Libya.

Sun Oil began exploration activities in the first half of 1981. On December 18, 1981, Sun Oil invoked the *force majeure* provision[2] contained in the EPSA and suspended performance. (D.I. 3 at 4; D.I. 12 at 6.) Sun Oil claimed that a State Department order prohibiting the use of United States passports for travel to Libya[3] prevented its personnel, all of whom were U.S. citizens, from going to Libya. (D.I. 12 at 5–6.) Thus, Sun Oil believed it could not carry out the EPSA "in accordance with the intentions of the parties to the contract." (*Id.* at 6 [footnote omitted].) NOC disputed Sun Oil's claim of *force majeure* and called for continued performance. (D.I. 3 at 4.)

In March of 1982, the U.S. Government banned the importation into the United States of any oil from Libya and severely restricted exports from the United States to Libya. 47 Fed.Reg. 10,507 (1982); 47 Fed.Reg. 11,247 (1982). Export regulations issued by the U.S. Department of Commerce required a license for the export of most goods, including all technical information. Because it "had planned to export

---

1. The arbitral award in dispute here was issued in Paris, France, under the auspices of the International Chamber of Commerce. France is a signatory of the Convention, and hence the requirement of reciprocity is satisfied. *See* 9 U.S.C. § 201 (West Supp.1989).

2. That clause reads as follows:
   22.1 *Excuse of Obligations*
      Any failure or delay on the part of a Party in the performance of its obligations or duties hereunder shall be excused to the extent attributable to force majeure. Force majeure

shall include, without limitation: Acts of God; insurrection; riots; war; and any unforeseen circumstances and acts beyond the control of such Party.
(D.I. 3, Exhibit A, Annex 1, EPSA ¶ 22.1, at 45–46.)

3. The passport regulation, issued pursuant to an executive order, stated that "United States passports shall cease to be valid for travel to, in, or through Libya unless specifically validated for such travel under the authority of the Secretary of State." 46 Fed.Reg. 60,712 (1981).

substantial quantities of technical data and oil technology to Libya in connection with the exploration program," Sun Oil claims that it filed for such an export license "so as to be prepared to resume operations in Libya promptly in the event the U.S. Government lifted the passport prohibition." (D.I. 12 at 7.) The application for a license was denied. (*Id.*) Thereafter, in late June of 1982, Sun Oil notified NOC that it was claiming the export regulations as an additional event of *force majeure.* (*See* D.I. 3 at 4; D.I. 12 at 7–8.)

On July 19, 1982, NOC filed a request for arbitration with the Court of Arbitration of the International Chamber of Commerce ("the ICC") in Paris, France, pursuant to the arbitration provision contained in the EPSA.[4] (D.I. 3 at 4.) The members of the arbitration panel ("the Arbitral Tribunal") were chosen in accordance with the arbitration clause. Each party picked one arbitrator; the third was chosen by the International Chamber of Commerce. Sun Oil selected Edmund Muskie, a former United States Senator and Secretary of State. NOC selected Professor Hein Kotz, Director of the Max Planck Institut in West Germany. Robert Schmelck, a former chief justice of France's supreme court (*la Cour de Cassation*), was selected as the third arbitrator by the ICC Court of Arbitration.

The arbitration proceedings were held in Paris, France. In May and June of 1984, the Arbitral Tribunal held hearings on the issue of *force majeure.* It issued an initial award on May 31, 1985, that stated there had been no *force majeure* within the meaning of the EPSA. (D.I. 3, Exhibit B, First Award at 67.) The Arbitral Tribunal later held further hearings, and on February 23, 1987, it rendered a second and final award in favor of NOC and against Sun Oil in the amount of twenty million U.S. dol-

lars. (*See* D.I. 3, Exhibit C, Final Award.) NOC has since been unable to collect payment from Sun Oil. (*See* D.I. 3 at 6.)

NOC filed this petition for confirmation of the Tribunal's award on July 24, 1989. (D.I. 3.) On September 15, 1989, Sun Oil moved to dismiss the petition. (D.I. 11.) The Court heard oral argument on November 29, 1989 and January 26, 1990.

### THE MOTION TO DISMISS

Sun Oil makes numerous arguments regarding why NOC's petition for recognition of this arbitral award should be dismissed. For the reasons stated below, the Court will deny Sun Oil's motion.

### I. *Recognition As Prerequisite For Access To U.S. Courts*

■ In support of its motion to dismiss NOC's petition, Sun Oil first advances the argument that NOC, as an arm of the Libyan Government, is not entitled to access to U.S. courts because of the status of U.S.–Libyan relations. NOC counters that it is an entity owned by a foreign government which is recognized by the U.S., and is thus entitled to access to our courts regardless of the present state of diplomatic relations between the U.S. and Libya. The Court agrees with NOC that it should not be barred from U.S. courts merely because of poor U.S.–Libyan relations.

In *Guaranty Trust Co. v. United States,* 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938), the Supreme Court affirmed the "generally accepted principle" that suit on behalf of a sovereign state "may be maintained in our courts only by that government which has been recognized by the political department of our own government as the authorized government of the foreign state." Later, in its landmark *Sabbatino* decision, the Court interpreted this rule to mean that an instru-

---

**4.** The arbitration clause states:

**23.2** *Arbitration*

Any controversy or claim arising out of or relating to this Agreement, or breach thereof, shall, in the absence of an amicable arrangement between the Parties, be settled by arbitration, in accordance with the Rules of Conciliation and Arbitration of the International

Chamber of Commerce, in Paris, France, by three arbitrators. Each Party shall appoint its arbitrator, and the International Chamber of Commerce shall appoint the third arbitrator who must be in no way related to either Party and who will be the chairman of the arbitration body.

(D.I. 3, Exhibit A, Annex 1, EPSA ¶ 23, at 47.)

mentality of the unfriendly but recognized Castro government in Cuba was entitled to access to U.S. courts. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 412, 84 S.Ct. 923, 931, 11 L.Ed.2d 804 (1964). Although it noted that diplomatic relations between the U.S. and Cuba had been severed, and the U.S. had imposed a commercial embargo against Cuba and frozen Cuban assets, the Court nevertheless concluded that it was "constrained to consider any relationship, *short of war*, with a *recognized* sovereign power as embracing the privilege of resorting to United States courts." *Id.* at 410, 84 S.Ct. at 931 (emphasis added).

The *Sabbatino* Court underscored the important point that recognition and the existence of diplomatic relations are not synonymous. *See id.* at 409 n. 10, 410, 84 S.Ct. at 930 n. 10, 931. While diplomatic relations may be severed "for any number of political reasons," such an act "does not approach that [expression of animosity] implicit in a declaration of war." *Id.* at 410, 84 S.Ct. at 931; *see also* 1 Restatement (Third) of the Foreign Relations Law of the United States § 203, comment d (1987) ("Recognition of a government is often effected by sending and receiving diplomatic representatives, but one government may recognize another yet refrain from assuming diplomatic relations with it. Similarly, breaking off relations does not constitute derecognition of the government.").

The Supreme Court more recently reaffirmed, in dictum, its adherence to this recognition-access principle. "It has long been established," stated the Court, "that only governments *recognized* by the United States and *at peace* with us are entitled to access to our courts...." *Pfizer Inc. v. Government of India,* 434 U.S. 308, 319–20, 98 S.Ct. 584, 591, 54 L.Ed.2d 563 (1978) (emphasis added). In sum, under existing

case law it is clear that NOC should not be barred from this Court unless the United States either does not recognize the Qadhafi Government, or is at war with Libya.

■ Significantly, Sun Oil does not argue that the Libyan Government is not recognized by the United States. Instead, Sun Oil argues that "[t]he *'outlaw regime'* of Libya's Mu'ammar Qadhafi is precisely the *type* of regime at which these [access-limiting] rules are aimed." (D.I. 12 at 17 [emphasis added].) Sun Oil further argues that the appropriate inquiry, for determining whether a foreign government should be denied access to U.S. courts based on foreign policy concerns, is no longer whether a government is "recognized." *Id.* at n. 17. Apparently, the United States traditionally "regarded recognition as a political weapon, not as something to be granted as a matter of international obligation. Its granting or refusal was discretionary and could be withheld to further national policy." R. Wallace, *International Law* 71 (1986). But, according to Sun Oil, "[i]n recent years, the U.S. practice has been to deemphasize and avoid the use of recognition in case of changes and instead to focus on the presence or absence of diplomatic relations." (D.I. 12 at 17 n. 17 [citation omitted].) *See also* R. Wallace, *supra;* 1 Restatement (Third) of the Foreign Relations Law of the United States § 203, reporters' notes at 87. Therefore, after detailing the decline of U.S.–Libyan relations,[5] Sun Oil concludes that the resulting breakdown in diplomatic relations bars the Libyan Government's access to U.S. courts. (D.I. 12 at 16.)

Nevertheless, Libya is still "recognized" by the U.S., albeit perhaps only "technically" given the unfriendly state of relations. At the very least, this is what NOC asserts (*see* D.I. 15 at 5, 10), and Sun Oil does not

---

5. The Libyan "government has been characterized by the President of the United States as an 'outlaw regime' and a 'pariah in the world community,'" and it has been "implicated in terrorist attacks throughout the world on United States citizens." (D.I. 12 at 14–15 [footnotes omitted].) Moreover,

Libya's military forces have attacked U.S. forces, and U.S. forces have responded. The

United States Embassy in Tripoli is closed as is the Libyan "Peoples' Bureau" in Washington, and virtually all economic transactions between the United States and Libya have been prohibited by the U.S. Government. The President has declared that there is currently a "national emergency" with respect to Libya....

(*Id.* at 15 [footnotes omitted].)

dispute. (*Cf.* D.I. 16 at 2.) Neither party has pointed to any Executive Branch statement purporting to derecognize the Libyan Government; and it seems clear that however poor relations with Qadhafi may be today, relations with Castro when *Sabbatino* was decided were at least equally strained. Thus, under the Supreme Court's *Sabbatino* analysis, the currently unfriendly state of diplomatic relations with Libya would not appear to be sufficient to bar the Libyan Government from U.S. courts.[6]

A second reason why the Libyan Government should not be barred from our courts because of the state of its diplomatic relations with the U.S. is that the Executive Branch has indicated its preference that the Libyan Government should be given access by granting NOC a license to initiate these proceedings.[7] (*See* D.I. 15A, Exhibit 2E.) In the words of one commentator,

> [I]t is safe to generalize that [in this area] the courts have attempted to support the policy of the executive branch whenever such policy is discernible ... and [thus] one may well conclude that the true significance of recognition or nonrecognition to the federal courts is that the act serves as a guidepost to the political wishes of the executive branch.

Annotation, *Access to Federal Courts by Foreign State, or National Thereof, Which United States Does Not Recognize or With Which United States Has No Diplomatic Relations*, 65 A.L.R. Fed. 881, 884 (1983 & Supp.1989); *see also* Comment, *Unrecognized Foreign Sovereign Court Access After National Petrochemical Co. of Iran v. The M/T Stolt Sheaf*, 12 Fordham Int'l L.J. 790, 817–18 (1989).

Indeed, the instant case is not unlike an earlier dispute litigated in this Court a few years ago. The latter case, *Transportes Aereos de Angola v. Ronair, Inc.*, 544 F.Supp. 858 (D.Del.1982), presented the question of whether a state-owned corporation of the People's Republic of Angola, a country with which the United States had no diplomatic relations, was entitled to access to U.S. courts. This Court held that because "the purpose of denying the privilege of suit to governments not recognized by the executive branch is solely to give full effect to that branch's sensitive political judgments," a determination by the executive branch that the unrecognized government, or its instrumentality, should be allowed to sue would naturally free a court from any restrictions placed on the exercise of its jurisdiction. *Id.* at 863–64.

Regardless of how repugnant the current Libyan Government may be to this Court and the American public, President Bush has not derecognized it. Instead, his Administration has seen fit to issue NOC a license to bring this suit. The Court has no choice here but to defer to the foreign policy wisdom of the Executive Branch.

## II. Treasury Regulations As A Bar To This Suit

In January of 1986, President Reagan declared that the policies and actions of the Libyan Government posed a sufficient

---

**6.** Sun Oil also argues that *Pfizer*, 434 U.S. at 319–20, 98 S.Ct. at 591, presents a more precise articulation of the recognition-access analysis applied in *Sabbatino*, 376 U.S. 398, 84 S.Ct. at 923. (*See* D.I. 16 at 2–5.) *Pfizer*, according to Sun Oil, establishes a two-part "test" for determining whether a foreign government is entitled to access to our courts: first, is the foreign government "recognized" and, secondly, is it "at peace" with the United States? *See Pfizer*, 434 U.S. at 319–20, 98 S.Ct. at 591; *see also supra* p. 806. Sun Oil maintains that even if Libya were thought to be "recognized," recent violent exchanges between our two countries mean that we are nonetheless not "at peace." (D.I. 16 at 3.)

The Court rejects this argument because the *Pfizer* language is merely dicta, and the opinion does not otherwise demonstrate an intent to alter *Sabbatino*'s reasoning. Moreover, as a practical matter, it is unlikely that this Court could determine whether the current level of tension in U.S.–Libyan relations was sufficient to warrant a finding that our countries are not "at peace," given the lack of a formal declaration of war from Congress. Such a determination would be nonjusticiable under the political question doctrine. *See* E. Chemerinsky, *Federal Jurisdiction* § 2.6, at 136–37 (1989).

**7.** Only the Executive Branch has the power to recognize a foreign government and, hence, determine which nations are entitled to sue in U.S. courts. *See Pfizer Inc. v. Government of India*, 434 U.S. at 319–20, 98 S.Ct. at 591.

threat to U.S. national security and foreign policy so as to constitute a "national emergency." Thus, pursuant to his delegated authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (West Supp.1989),[8] the President issued two executive orders imposing economic sanctions on Libya, and authorizing and directing the Secretary of the Treasury to promulgate implementing regulations. *See* Exec. Order No. 12543, 51 Fed.Reg. 875 (Jan. 7, 1986); Exec. Order No. 12544, 51 Fed.Reg. 1235 (Jan. 8, 1986).[9] The regulations subsequently issued by the Secretary, which are those at issue in the instant case, are called the Libyan Sanctions Regulations ("the Regulations"). 51 Fed.Reg. 1354–59 (Jan. 10, 1986); 31 C.F.R. pt. 550 (1986). The Regulations provide, in pertinent part, as follows:

> *Unless licensed* or authorized pursuant to this part, any attachment, *judgment*, decree, lien, execution, garnishment or other judicial process is *null and void* with respect *to any property in which* on or since 4:10 p.m. e.s.t., January 8, 1986, *there existed an interest of the Government of Libya.*[10]

51 Fed.Reg. 2462 (Jan. 16, 1986); 31 C.F.R. pt. 550, § 550.210(e) (1987) (emphasis added). Licenses are issued by the Treasury Department's Office of Foreign Assets Control ("OFAC").

### a. License for Initiating Suit

■■■ Sun Oil argues that NOC's petition should be dismissed because NOC filed this action without a license. Even though OFAC has now granted NOC a license to cover this proceeding, Sun Oil claims that the Regulations' alleged requirement for a license *before* suit can be filed is jurisdictional in nature, and hence cannot be circumvented by issuance of a license that does not specifically provide for retroactive effect.

NOC argues precisely the opposite. It contends that the Regulations did not require it to obtain a license to initiate this proceeding. It did, however, procure such a license without conceding that it was required to do so. Thus, NOC maintains that the issue of whether a license is necessary for initiation of suit is now moot.

Sun Oil's arguments are without avail. Although it is true that a license meant to have retroactive effect must state as much, *see* 31 C.F.R. § 550.501(a), the fact is that the license issued to NOC does just that. License number 00595 specifically authorizes all of the transactions or acts necessary for initiating this particular lawsuit in this particular Court. (*See* Exhibit 2E, D.I. 15A.) A license could hardly be more specific.

Sun Oil's claim that a license to initiate suit is a jurisdictional requirement that cannot be cured retroactively is similarly without merit, and has been rejected by numerous courts. *See, e.g., Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360 (11th Cir.1984); *cf. National Airmotive v. Gov't & State of Iran*, 499 F.Supp. 401,

---

**8.** When the President has declared a national emergency pursuant to 50 U.S.C. § 1701 of the IEEPA, he is authorized, "under such regulations as he may prescribe, by means of instructions, licenses, or otherwise," to:

> (A) investigate, regulate, or prohibit—
> (i) any transactions in foreign exchange,
> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
> (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which

any foreign country or a national thereof has any interest; by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1).

**9.** On January 4, 1990, in accordance with the requirements of the National Emergencies Act, 50 U.S.C. § 1622(d) (West Supp.1989); *see also* IEEPA, 50 U.S.C. §§ 1703(d) & 1706 (West Supp.1989), President Bush continued the state of emergency previously declared with respect to Libya. 55 Fed.Reg. 589 (1990).

**10.** Under the Regulations, the term "Government of Libya" specifically includes a corporation that, like NOC, is "substantially owned or controlled" by the Libyan Government. *See* 31 C.F.R. pt. 550, § 550.304(2).

404–05 (D.D.C.1980). The regulations do not deprive this Court of jurisdiction. Rather, to the extent they apply, they merely effect a change in the governing substantive law. Here, the Court need not decide what, if any, effect the lack of a license for initiating a lawsuit would have because the Court finds, as NOC urges, that this issue is now moot.

b. License for Entry of Judgment

■ Sun Oil argues that even if NOC's license is valid for *initiating* suit, judgment cannot be *entered* in favor of NOC without a further license. Sun Oil contends that, since judgment cannot be entered, NOC lacks standing because its claim cannot be redressed by this Court.

To support its position that the Regulations forbid the entry of judgment in this case, Sun Oil relies on the language contained in the Regulations, especially in section 550.210(e), as well as the language in the specific license obtained by NOC. The license issued to NOC on October 6, 1989, by OFAC, grants permission for "[a]ll transactions necessary for the initiation and conduct" of these and related legal proceedings begun in the Eastern District of Pennsylvania. (Lic. No. L–00595, Exhibit 2E, D.I. 15.) However, the license also expressly states that it is not to "be construed as authorizing the transfer of any blocked funds, or *entry* or execution of *any judgment.*" (*Id.* [emphasis added].) A letter from the director of OFAC that accompanies the license, and is addressed to counsel for NOC, also states that *"no entry of judgment* or execution thereon may be made with respect to either case without a *further specific license"* from OFAC. (Letter of October 6, 1989 from R. Richard Newcomb, Director of OFAC, to Preston Brown, Esq., Attorney for NOC, Exhibit 2E, D.I. 15 [emphasis added].)

NOC argues that the Regulations do not require a license to allow a judgment to be entered in its favor in this case. It contends that the Regulations bar only the

unlicensed execution of any judgment entered by this Court. According to NOC, Sun Oil's interpretation, that mere *entry* of judgment is barred, would render the Regulations unconstitutional. NOC acknowledges that OFAC's position is, like Sun Oil's, that any judgment entered by this Court will be null and void, unless NOC obtains a license for this particular purpose. (*See* D.I. 15 at 21–22 n.*.) But NOC maintains that OFAC's interpretation of the effect of the Regulations is incorrect. (*Id.*)

In support of its reading of the Regulations, NOC proffers cases interpreting analogous foreign asset control regulations. All of these cases support the proposition that foreign blocking regulations bar only those judicial proceedings that effect a transfer of foreign property or property interests. *See, e.g., Dean Witter Reynolds, Inc.,* 741 F.2d at 361–62. Not too surprisingly, therefore, in none of these cases were the applicable blocking regulations found to bar the mere entry of judgment.[11]

Sun Oil does not cite a single case to support its interpretation of the Regulations. More importantly, it does not distinguish, or even discuss, the long line of authority relied on by NOC. The Court's own research uncovered numerous cases, in addition to those cited by NOC, that interpreted analogous blocking regulations as barring only judicial acts that would effect a transfer of foreign property or property interests. *See, e.g., Itek Corp. v. First National Bank of Boston,* 704 F.2d 1, 9–10 (1st Cir.1983). In only one case did a court read blocking regulations as prohibiting an unlicensed entry of judgment. *See Chase Manhattan Bank v. United China Syndicate, Ltd.,* 180 F.Supp. 848, 849 (S.D. N.Y.1960) (construing Foreign Assets Control Regulations as prohibiting the entry of a default judgment against Chinese defendant). That court's reasoning has been severely criticized, *see* Goodman, *United*

---

11. Although apparently this is the first time the Libyan Regulations have been interpreted, the cases relied on by NOC are persuasive because the language of the pertinent provisions is so similar to that interpreted by these other courts. *Compare* 31 C.F.R. § 550.210(e) (Libyan Regulations) *with* 31 C.F.R. § 535.203(c) (Iranian Regulations).

*States Government Foreign Property Controls,* 52 Geo.L.J. 767, 796–98 (1964) (characterizing the decision as "erroneous"); *Vishipco Line v. Chase Manhattan Bank,* No. 77 Civ. 1251 (RLC), slip op. at 15 (S.D.N.Y. Nov. 3, 1978) ("this case is no longer consistent with the weight of authority"), and does not apply to the facts of this case.

The sheer volume of cases supporting NOC's view is impressive. But its constitutional arguments are equally compelling. NOC contends that since only Congress can interfere with this Court's jurisdiction, any reading of the Regulations that would prevent the entry of judgment would be unconstitutional. *See National Airmotive,* 499 F.Supp. at 405 n. 9. NOC further argues that Congress has not and cannot delegate its exclusive constitutional authority to expand or abridge the jurisdiction of the federal courts. Whether Congress can ever delegate its power over the jurisdiction of the federal courts need not be addressed. In this case the Court finds, as NOC urges, that Congress has not attempted to do so.

### 1. *President's Authority Under the IEEPA*

In *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the Supreme Court examined the scope of the power Congress granted the President under the IEEPA, the statute pursuant to which foreign blocking regulations are promulgated. *Dames & Moore* involved a challenge to the validity of the President's suspension of claims against the Iranian Government still pending in U.S. courts, and his nullification of attachments obtained against Iranian assets in the United States. After reviewing the statutory and regulatory framework under which the President acted, the Court held that the IEEPA specifically authorized the Presi-

dent to nullify the attachments and order the transfer of blocked Iranian assets. *Id.* at 674, 101 S.Ct. at 2983–84. The Court further noted that the President also had the "authority to prevent or condition attachments ..." in the first place. *Id.* at 674 n. 6, 101 S.Ct. at 2983–84 n. 6. But the statute could *not* also be read to authorize the suspension of claims pending in U.S. courts. *Id.* at 675, 101 S.Ct. at 2984. The latter holding is pertinent to the present case because barring the entry of an unlicensed judgment is similar to suspending claims. The Court reasoned the following:

> We conclude that although the IEEPA authorized the nullification of the attachments, it cannot be read to authorize the suspension of the claims. The claims of American citizens against Iran are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property. An *in personam* lawsuit, although it might eventually be reduced to judgment and that judgment might be executed upon, is an effort to establish liability and fix damages and does not focus on any particular property within the jurisdiction. The terms of the IEEPA therefore do not authorize the President to suspend claims in American courts. This is the view of all the courts which have considered the question.

*Id.* (citations omitted). The President's suspension of claims was eventually upheld on other grounds.[12] *See id.* at 688, 101 S.Ct. at 688.

In interpreting the extent to which the Iranian Regulations were authorized by Congress under the IEEPA, the Court emphasized that "the congressional purpose in authorizing blocking orders is 'to put control of foreign assets in the hands of the President....'" *Id.* at 673, 101 S.Ct. at 2983 (quoting *Propper v. Clark,* 337 U.S. 472, 493, 69 S.Ct. 1333, 1345, 93 L.Ed. 1480

---

12. The President had purported to act pursuant to his powers under the IEEPA and 22 U.S.C. § 1732, the "Hostage Act." Exec.Order No. 12294, 46 Fed.Reg. 14111 (1981). The Court rejected the notion that either statute authorized suspension of claims in U.S. courts. *Dames & Moore,* 453 U.S. at 678, 101 S.Ct. at 2986. But the Court went on to conclude based on "infer-

ences [that could] be drawn from the character of the legislation Congress ha[d] enacted in the area, such as the IEEPA and the Hostage Act, and from the history of acquiescence in executive claims settlement ... that the President was authorized to suspend pending claims...." *Id.* at 686, 101 S.Ct. at 2990.

(1949)). Because these "frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country," the Court found it would not make sense "to allow individual claimants throughout the country to minimize or wholly eliminate this 'bargaining chip' through attachments, garnishments, or similar encumbrances on property." *Id.* But the same reasoning did not apply to the suspension of claims because the President's control over foreign property would not be similarly threatened or diminished by *in personam* lawsuits that merely seek to establish liability. *See id.* at 675, 101 S.Ct. at 2984.

The logic of *Dames & Moore* dictates the conclusion that the IEEPA cannot be read as authorizing the President to direct the promulgation of regulations that bar the mere entry of judgment in a case such as this. NOC is asserting an *in personam* claim that consists of nothing more than an effort to establish liability and fix damages.[13] No property in the United States would be affected by the mere entry of judgment. Therefore, the IEEPA does not provide statutory authority for Executive regulations that would prevent the entry of judgment by this Court.[14]

### 2. *President's Power to Settle Claims*

Sun Oil makes an alternative argument that does not depend solely on the IEEPA. Essentially, Sun Oil contends that the combination of factors [15] that led the Supreme Court in *Dames & Moore* to uphold the President's suspension of claims, brought by American citizens against Iran, should be sufficient to uphold what it terms as "the more limited action at issue here," namely the "regulation of the entry of

judgment relating to the claim of a hostile foreign regime...." (D.I. 25 at 12.) Sun Oil mischaracterizes both the Court's opinion in *Dames & Moore*, and the implications of the reading of the Regulations it advocates.

Although in *Dames & Moore* the Court did uphold the suspension of claims, it did so only on fairly narrow grounds:

> [W]e re-emphasize the narrowness of our decision. We do not decide that the President possesses plenary power to settle claims, even as against foreign governmental entities ... But where, as here, the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between our country and another, and where, as here, we can conclude that Congress acquiesced in the President's action, we are not prepared to say that the President lacks the power to settle such claims.

*Dames & Moore*, 453 U.S. at 688, 101 S.Ct. at 2991. The Court concluded, *in light of Congress's apparent acquiescence,* that the President had the power to settle claims pursuant to an *executive agreement* negotiated with a foreign government to resolve a foreign policy crisis. It was critical that the contested Executive action was taken pursuant to an executive agreement designed to settle the claims of U.S. citizens against a foreign power because the Court determined "that Congress has implicitly approved the practice of claim settlement by executive agreement." *Id.* at 680, 101 S.Ct. at 2987. Although "[p]ast practice does not, by itself, create power ...," *id.* at 686, 101 S.Ct. at 2990, the

---

**13.** Although NOC is petitioning to confirm an arbitral award, its claim merely seeks confirmation by this Court of Sun Oil's liability, albeit as established by the Arbitral Tribunal. The effect of entering judgment in this case would be the same as if NOC had sued Sun Oil for breach of contract, instead of moving for confirmation of an arbitral award finding Sun Oil liable for that breach.

**14.** Sun Oil makes reference to several other statutes, pursuant to which—along with the IEEPA—the President claimed to be acting when he ordered promulgation of the Libyan Regula-

tions. (D.I. 25 at 11 n. 11.) Sun Oil has not argued that any statute other than the IEEPA provides the President with authority to regulate the entry of judgments. The Court would just note, however, that none of these other statutes furnishes any such authorization in this case. *See, e.g.,* National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.;* International Security and Development Cooperation Act of 1985, 22 U.S.C. §§ 2349aa–8 to 2349aa–9; Federal Aviation Act of 1958, 49 U.S.C. § 1514; 3 U.S.C. § 301.

**15.** *See supra* note 12.

Court concluded that in *Dames & Moore* there was more: namely, " 'a *systematic, unbroken, executive practice,* long pursued to the knowledge of the Congress and *never before questioned* . . . [that could] be treated, as a *gloss* on "Executive Power" vested in the President by § 1 of Art. II.' " *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–11, 72 S.Ct. 863, 897, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)) (emphasis added).

The *Dames & Moore* rationale for upholding the President's suspension of claims is inapplicable to what Sun Oil calls the Libyan Regulations' reasonable control over the entry of judgment on a claim brought by Libya. President Bush has not entered into any executive agreement to settle the claims of U.S. citizens against Libya. Thus, that the President might have the power, *not employed here,* to settle or suspend a claim between Sun Oil and NOC, through negotiation of an executive agreement with Libya, is simply irrelevant. Moreover, contrary to Sun Oil's contentions, regulating the entry of judgments is not a more modest power than suspending claims pursuant to an executive agreement. But even if it were a more modest power, Sun Oil has not pointed to any evidence that Congress has acquiesced in the President's use of it. Similarly, Sun Oil has not demonstrated that the Executive has exercised its allegedly modest power to regulate the entry of judgments in the requisite systematic, unbroken, and unquestioned manner.[16] *See Dames & Moore,* 453 U.S. at 686, 101 S.Ct. at 2990. Accordingly, the Court concludes that in this case the President does not have the power to prohibit the mere entry of judgment by this Court.[17]

### 3. *President's Power to Change the Governing Law*

Sun Oil's final argument is that interpreting the Regulations as barring the entry of judgment would not render them unconstitutional because such a reading would not improperly divest this Court of jurisdiction. Rather, Sun Oil contends that the bar against entry of judgment would simply be, such as the suspension of claims in *Dames & Moore,* a legitimate Executive action that creates new substantive rules of law.[18]

Sun Oil misses the critical issue. It is true that, given *Dames & Moore,* the President arguably has the power to enter into an executive agreement with Libya which settles claims existing between U.S. and Libyan citizens. It is also true that such an agreement would change the law governing claims between Americans and Libyans, and this Court would be bound to apply the substantive rule of law created by the executive agreement. The President must, however, have in the first place the power to do the act that produces the alleged change in the governing law. *Cf. Dames & Moore,* 453 U.S. at 685, 101 S.Ct. at 2989 (noting examples of how the President changes the governing law by doing acts that he is empowered to do).

In this case, the Court has already concluded that the President's statutory authority is limited to regulating those judicial processes that would effect a transfer of foreign property or property interests. Moreover, any power he may have under *Dames & Moore* is not applicable here. The Court therefore rejects this argument.

---

**16.** Sun Oil argues that blocking regulations such as the Libyan Regulations have been upheld numerous times in the past. As stated previously, however, *see supra* pp. 809–810, virtually every time the regulations were upheld they were read as *not* barring the mere entry of judgment.

**17.** This result does not hamper the President's ability to meet foreign policy objectives that necessitate keeping undesirable foreign governments out of U.S. courts. The President can always refuse in the first instance to recognize such a government; or he can derecognize a recognized government that later displeases his administration. *See supra* pp. 805–808. Furthermore, as noted previously, *see supra* pp. 807–808, in this case at least, the Executive Branch has indicated that it *prefers* that the suit proceed.

**18.** The Court acknowledges what NOC has repeatedly pointed out: Sun Oil's various arguments, regarding the relationship between the Regulations and the jurisdiction of this Court, are arguably irreconcilable. (*Compare* D.I. 16 at 6 *with* D.I. 25 at 12–15.)

### III. Denial of Sun Oil's Motion to Dismiss

Having rejected all of the arguments offered by Sun Oil in support of its interpretation of the Regulations, the Court will read the language here in dispute as virtually every court before it. The Libyan Regulations prohibit only those judicial acts that transfer Libyan property or property interests. Thus, the Libyan Regulations do not bar this Court from entering judgment in this case, and Sun Oil's standing arguments must fail. Furthermore, for the reasons previously mentioned, this Court has already determined that NOC should not be barred from U.S. courts because of the state of U.S.–Libyan relations. Therefore, having found all of its arguments without merit, the Court will deny Sun Oil's motion to dismiss NOC's petition.

### THE MOTION TO ENFORCE THE ARBITRAL AWARD

■ The Convention on the Recognition and Enforcement of Foreign Arbitral Awards attempts "to *encourage* the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974) (citations omitted) (emphasis added). This Court must recognize the award rendered by the ICC Arbitral Tribunal in NOC's favor unless Sun Oil can successfully assert one of the seven defenses enumerated in Article V of the Convention. *Cf. Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de l'Industrie du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir.1974). Sun Oil has invoked three of the seven defenses against recognition. (D.I. 12 at 23–24.) It bears the burden of proving that any of these defenses is applicable. *Imperial Ethiopian Gov't v. Baruch–Foster Corp.*, 535 F.2d 334, 336 (5th Cir.1976); *Al Haddad Bros. Enterprises, Inc. v. M/S Agapi*, 635 F.Supp. 205, 209 (D.Del.1986), *aff'd without opinion*, 813 F.2d 396 (3d Cir. 1987).

After considering the evidence and arguments of the parties, this Court, for the reasons outlined below, rejects Sun Oil's defenses and concludes that the arbitral award is entitled to recognition and enforcement under the Convention.

### I. Use of "False and Misleading" Testimony

Sun Oil's first ground for asserting that the arbitral award should not be recognized revolves around the Arbitral Tribunal's reliance on the testimony of a Mr. C. James Blom, a witness for NOC. Essentially, Sun Oil claims that Mr. Blom's testimony was false and misleading, that this testimony was critical to the Arbitral Tribunal's decision, and, therefore, that recognition of the award would violate Sun Oil's due process rights.[19] Mr. Blom's testimony was misleading, according to Sun Oil, because the Arbitral Tribunal was given the incorrect impression that Mr. Blom, a former vice president of Occidental Petroleum Corporation ("Occidental"), was in charge of Occidental's Libyan operations during the time period at issue. Sun Oil also charges that Mr. Blom's testimony, "on the central issue of the case" (D.I. 16 at 10), was false. Specifically, Sun Oil challenges Mr. Blom's assertion before the Tribunal that Occidental replaced its 230 American employees in Libya primarily with Canadians from its Canadian subsidiary. According to Sun Oil, this assertion was critical because one of NOC's main contentions during the arbitration was Sun Oil's alleged ability to perform under the EPSA by drawing on its

---

19. Sun Oil claims this first argument for urging non-recognition of the award is based on two of the Convention's enumerated defenses, namely sections 1(b) and 2(b) of Article V. Section 1(b) provides a defense against recognition of an award upon proof that "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case...." Section 2(b) provides that an award may be refused recognition if its enforcement or recognition "would be contrary to the public policy" of the country in which recognition is sought.

Canadian subsidiary for personnel, as Occidental had allegedly done.

Intentionally giving false testimony in an arbitration proceeding would constitute fraud. *Cf. Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir.), *cert. denied*, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982). But "in order to protect the finality of arbitration decisions, courts must be slow to vacate an arbitral award on the ground of fraud." *Id.* (citation omitted). Accordingly, "[t]he fraud must not have been discoverable upon the exercise of due diligence prior to the arbitration." *Id.* (citation omitted). The alleged fraud must also relate to a material issue. *See Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 600 (3d Cir.) (perjury does not justify vacation of an arbitral award if it relates to "an issue remote from the question to be decided"), *cert. denied*, 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968); *cf. Dogherra*, 679 F.2d at 1297.

### a. Mr. Blom's Credentials

■ Sun Oil's first challenge, regarding the alleged misrepresentation of Mr. Blom's credentials, borders on the frivolous. It is true that the Tribunal appears to have misunderstood the extent of Mr. Blom's actual duties.[20] But there is no reason to conclude that NOC was at fault for this misapprehension.

---

**20.** The Arbitral Tribunal concluded Mr. Blom's position as head of Eastern Hemisphere Exploration meant he was in charge of Occidental's Libyan operations. (*See* D.I. 3, Exhibit B, First Award at 51.)

**21.** *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378 (11th Cir.1988), on which Sun Oil relies, presents very different facts. First, as NOC emphasizes, the appellants in *Bonar* were not given advance notice that the expert in question was going to testify, while Sun Oil received information about Mr. Blom over half a year in advance. Secondly, the misperception as to the *Bonar* expert's credentials was caused *by the expert*, who deliberately perjured himself on the stand. Even more importantly, however, the "expert" in *Bonar* turned out to be an actual fake. That is, he lied about *all* of his credentials—where he went to school, what degrees he had, and what jobs he had held.

Mr. Blom's testimony was completely accurate. During the 1984 hearings, he stated, on direct examination by counsel for NOC, that he lived and worked in Libya from 1967 to 1969, when he was transferred to Bakersfield. (*See* D.I. 15A, Exhibit 6B, Transcript of First Award Hearing at 69.) He also stated that after his transfer he was eventually promoted to vice president of Eastern Hemisphere Exploration, although he continued to reside in Bakersfield. (*Id.* at 70.) If the Tribunal got the wrong impression about Mr. Blom's relationship with Occidental's Libyan operations or the meaning of his area of responsibility (the "Eastern Hemisphere"), it is Sun Oil's own fault.

Counsel for Sun Oil had ample opportunity to cross-examine Mr. Blom regarding the extent of his duties. (*See, e.g.*, D.I. 15A, Exhibit 6B, Transcript of First Award Hearing at 87–101.) Counsel simply chose not to do so. Moreover, Mr. Blom's appearance as a witness was not a surprise. NOC had provided Sun Oil with its list of witnesses over six months before Mr. Blom testified. (*See* D.I. 15A, Exhibit 6A.) That list not only identified Mr. Blom as an NOC witness, but also noted his credentials and relationship to Occidental, and stated as to which matters he would testify.[21] (*See id.* at 6.)

Sun Oil emphasizes Mr. Blom's *second* appearance before the Tribunal, after the First Award had already been entered.[22]

---

Mr. Blom, on the other hand, was completely truthful about his credentials. It was the Tribunal itself that drew the wrong conclusion. Moreover, this "error" was not material. Even though Mr. Blom was not in Libya or in charge of Occidental's Libyan operations during the period when the EPSA was negotiated and in effect, Sun Oil has not argued that he was not qualified to give an expert opinion as to the meaning of the EPSA or market conditions for qualified personnel for oil exploration activities in Libya. Unlike the *Bonar* "expert," Mr. Blom did have legitimate credentials: he had previously lived and worked in Libya, and during the relevant period was still working as a vice president for Occidental.

**22.** As already explained, *see supra* p. 805, the first set of hearings were held in 1984 and resulted in the issuance of the Tribunal's "First Award," which determined that Sun Oil had not properly invoked the EPSA's *force majeure* pro-

Sun Oil argues that at this point, since the Tribunal's misapprehension of Mr. Blom's credentials was apparent from its statements in the First Award, NOC should have informed the Tribunal of the "error" if it was going to rely on Mr. Blom's testimony again. Although perhaps NOC should have corrected the Tribunal's misperception,[23] it did not present any false testimony, even at Mr. Blom's second appearance. Thus, there was no "knowing use of false testimony," as Sun Oil defines the alleged fraud. (D.I. 12 at 32.)

b. Alleged Use of Canadian Personnel

■ Sun Oil's second challenge to Mr. Blom's testimony has more force, but is nonetheless not sufficient to warrant non-recognition of the Tribunal's award. Mr. Blom's statement that Occidental replaced its American personnel with Canadians does in fact appear to have been inaccurate. (*See* D.I. 12A, Exhibits 5 & 6. *Compare* Aff. of Mr. Blom, D.I. 15A, Exhibit 6 *with* Transcript of Mr. Blom's Testimony, D.I. 15A, Exhibit 6B.) But, as with its first challenge, Sun Oil has not produced any

evidence to show that this inaccuracy was anything other than unintentional.

Mr. Blom testified that about half of Occidental's 230 American employees in Libya were replaced primarily by Canadians from its Canadian subsidiary and British citizens from Occidental's London office. (D.I. 15A, Exhibit 6B, Transcript of Mr. Blom's Testimony at 75.) Mr. Blom now states that those 230 American employees were replaced with "non-Americans," half of whom came from within the Occidental organization. (*See* D.I. 15A, Exhibit 6, Aff. of Mr. Blom at 4–5.) Therefore, the essential point of Mr. Blom's testimony is reaffirmed in his affidavit: Sun Oil could have replaced its personnel in Libya with non-Americans, as Occidental did.[24] (*Id.* at 5.) The affidavits offered by Sun Oil to counter Mr. Blom's testimony do not controvert this critical point.[25] (*Cf.* D.I. 12A, Exhibits 5 & 6.)

The most important consideration of all, however, is that Sun Oil was able to present all of these arguments to the Arbitral Tribunal. (*See id.* at 31 n. 25; D.I. 15A, Exhibit 6, Affidavit of Mr. Blom at

---

visions. Subsequently, more hearings were held in December of 1985 and June of 1986. In February of 1987, the Tribunal issued its "Final Award," which dealt with the issues of liability and damages.

Mr. Blom testified initially during the pre-First Award hearings. A transcript is available of this testimony. (*See* D.I. 15A, Exhibit 6B.) Mr. Blom testified a second time in June of 1986. Apparently, no transcript of this testimony is available.

**23.** Even if this were viewed as an impropriety on NOC's part, such misconduct would not be sufficient grounds for refusing to recognize the Tribunal's award. In light of all of the facts, the Court finds that NOC's failure to act affirmatively to correct the Tribunal's misunderstanding regarding Mr. Blom's credentials is hardly the type of misconduct that would deprive Sun Oil of a fair hearing. *Cf. Apex Fountain Sales, Inc. v Kleinfeld,* 818 F.2d 1089, 1094 (3d Cir.1987) ("[M]isconduct apart from corruption, fraud, or partiality in the arbitrators justifies reversal only if it so prejudices the rights of a party that it denies the party a fundamentally fair hearing.").

**24.** *Contrary to Sun Oil's assertions, the Court* concludes that Mr. Blom's inaccurate statement that Occidental had used some Canadian em-

ployees of its Canadian subsidiary was not material to the Arbitral Tribunal's decision. The Tribunal's own characterization of Mr. Blom's testimony illustrates the fact that the critical issue was whether *any* non-Americans, not necessarily Canadians, were available to replace Sun Oil's American personnel in Libya:

> Mr. BLOM has testified that Occidental Oil Corporation was able to continue its Libyan production and exploration operations despite the Passport Order by replacing, within a few months, no less than 230 American nationals by an equal number of *non-U.S. personnel partly from within the Occidental group of companies, partly from outside sources.*

(D.I. 3, Exhibit B, First Award at 51 [emphasis added].)

**25.** *Harre v. A.H. Robins Co., Inc.,* 750 F.2d 1501 (11th Cir.1985), *vacated in part,* 866 F.2d 1303 (11th Cir.1989), is therefore inapposite. The *Harre* court simply concluded that the appellant's Rule 60(b) motion for a new trial should have been granted where the record showed that "a material expert witness testified falsely on the *ultimate issue in the case,* ... [and] the defense attorneys knew or should have known of the falsity of the testimony." *Harre,* 750 F.2d at 1503 *(emphasis added).* Here, the Court finds that the inaccurate testimony did not relate to an ultimate issue in the case.

3–4.) *See also Waterside Ocean Navigation Co., Inc. v. International Navigation Ltd.*, 737 F.2d 150, 153 (2d Cir.1984); *Biotronik Mess-und Therapiegeraete GmbH & Co. v. Medford Medical Instrument Co.*, 415 F.Supp. 133, 137 (D.N.J.1976). Mr. Blom's affidavit, which recounts what transpired during his second appearance before the Tribunal in June of 1986, attests to the fact that all of Sun Oil's current arguments were made to, and hence implicitly rejected by, the Tribunal:

> 5. At those [June 1986] hearings, although no prior notice had been provided to me or counsel for NOC, counsel for Sun Oil raised issues concerning my credibility and the accuracy of the testimony which I had given at the *force majeure* hearings two years earlier. In particular, counsel for Sun Oil, purporting to establish that I had misrepresented my credentials to the Tribunal, read to the Tribunal from a statement of Dudley Miller pointing out that I was not in charge of Occidental's Libyan operations in 1981 and 1982. In addition, counsel for Sun Oil asserted that my testimony concerning Occidental's replacement of its U.S. personnel with Canadian personnel from its subsidiary CanOxy was erroneous and read from a statement of Ian Cumming that no CanOxy personnel were used in Occidental's Libyan operations. These statements which were offered to the Arbitral Tribunal in 1986 are identical in all material respects to the statements presented to this Court in the affidavits of Mr. Miller and Mr. Cumming.

(D.I. 15A, Exhibit 6, Aff. of Mr. Blom at 4; *see also* D.I. 15A, Exhibit 6C, Mr. Blom's Handwritten Notes of June 1986 Hearing, at 9–10 [pages not numbered].) Sun Oil has not exactly offered an alternate picture of what occurred during this second hearing. Its few comments on this issue are rather ambiguous [26] and are not supported by any affidavits or other evidence.

The Court therefore accepts Mr. Blom's description of the second hearing, and concludes that Sun Oil was not prevented from presenting its case. *See* Convention, art. V., sec. 1(b). In addition, Sun Oil has not proven fraud. Alternatively, even assuming the alleged fraud did occur, it did not relate to a material issue in the arbitration, and Sun Oil could have discovered it during the proceedings.

II. *Damage Award Not Supported by the Evidence*

Sun Oil's second challenge to confirmation of the award focuses on the $20 million the Tribunal granted in damages. According to Sun Oil, confirmation of the award should be denied based on article V, section 1(c),[27] because the arbitrators exceeded their authority, and based on article V, section 2(b), the Convention's public policy defense, because confirmation would violate due process. Sun Oil argues that the Tribunal exceeded its authority because it did not base its damage award on the evidence presented and instead acted as an *amiable compositeur*, which tries to reach merely an equitable, and not necessarily legal, result.[28] Sun Oil also argues that the Tribunal did not have jurisdiction to consider NOC's claims based on Article 8.2 of the EPSA because such claims were

---

**26.** NOC's counsel, Mr. Riedinger, objected during the June 1986 hearing before the panel to the introduction of any evidence on this subject [i.e. Mr. Blom's prior testimony], and objected to any questioning of Mr. Blom on this subject by either the panel or Sun's counsel. While one of the arbitrators had begun to question Mr. Blom, that inquiry stopped abruptly after Mr. Riedinger's objections. The panel thus received no evidence on this subject and expressed no views on it in its Awards or elsewhere. (D.I. 16 at 15.)

**27.** Recognition may be denied if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration...." Convention, art. V, sec. 1(c).

**28.** When submitting a dispute to arbitration, the parties can request that the arbitrators act as *amiable compositeurs*, which means that the arbitrators can "tak[e] into consideration not only legal rules, but also what they believe justice, fairness, and equity direct[ ]." Lecuyer–Thieffry & Thieffry, *Negotiating Settlement of Disputes Provisions in International Business Contracts: Recent Developments in Arbitration and Other Processes,* 45 Bus.Law. 577, 591 (1990).

outside the scope of the Terms of Reference to which the parties agreed before submitting their dispute to arbitration.

Article V, section (1)(c) of the Convention, on which Sun Oil relies, "tracks in more detailed form § 10(d) of the Federal Arbitration Act, 9 U.S.C. § 10(d), which authorizes vacating an award '[w]here the arbitrators exceeded their powers.'" *Parsons & Whittemore Overseas Co.*, 508 F.2d at 976. Like other Convention defenses to enforcement of a foreign arbitral award, this defense "should be construed narrowly." *Id.* Its counterpart, section 10(d) of the Federal Arbitration Act, has also been given a narrow reading. *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 703 (2d Cir.1978).

The Third Circuit recently addressed a claim that an arbitral award should be vacated because the arbitrators exceeded their powers in violation of section 10(d) of the Federal Arbitration Act. That case, *Mutual Fire, Marine & Inland Insurance Co. v. Norad Reinsurance Co.*, 868 F.2d 52 (3d Cir.1989), describes the inquiry a court should undertake as follows:

> It is ... well established that the "court's function in confirming or vacating a commercial [arbitration] award is severely limited." In conducting our review we must examine both the form of relief awarded by the arbitrator as well as the terms of that relief. We must determine if the form of the arbitrators' award can be *rationally derived* either from the agreement between the parties or from the parties submissions [sic] to the arbitrators. In addition, the terms of the arbitral award will not be subject to judicial revision unless they are *"completely irrational."*

*Norad Reinsurance Company*, 868 F.2d at 56 (citations omitted) (emphasis added). For the reasons stated below, the Court finds that the Tribunal's award of damages was "rationally derived" from the parties' agreement and that the terms of the award are not "completely irrational."

**29.** Sun Oil made the same jurisdictional argument before the Tribunal. It was rejected for

**a. Jurisdiction of the Tribunal**

■ The arbitration clause contained in the EPSA is very broad. It provides, *inter alia*, that *"[a]ny controversy or claim* arising out of or relating to this Agreement, or breach thereof, shall, in the absence of an amicable arrangement between the Parties, be settled by arbitration...." (D.I. 3, Exhibit A, Annex 1, EPSA ¶ 23.2, 47 [emphasis added].) The Terms of Reference, pursuant to which the dispute underlying this case was submitted to arbitration, specifically state that one of the "issues to be determined" at arbitration was "[t]o what relief, if any, is each party entitled?" (D.I. 3, Exhibit A, Annex 2, Terms of Reference ¶ IV(E), at 5.) In addition, as stated in the Terms of Reference, NOC's claims included the allegation that Sun Oil was "liable to NOC for all remedies and amounts available under the EPSA and the applicable law...." (*Id.* ¶ III(A)(2), at 2–3.) Thus, the issue of damages, under Article 8.2 or any other provision of the EPSA, was properly before the arbitrators.[29]

**b. The Tribunal's Rationale for Damages**

■ After evaluating whether and to what extent Sun Oil was liable for damages, the Arbitral Tribunal concluded that Article 8.2 of the EPSA constituted a liquidated damages provision. Article 8.2 states in pertinent part:

8.2 *Failure to complete Exploration Program*

In the event that any part of the Exploration Program for any Area is not properly completed by the end of the Exploration Period applicable to such Area, Second Party [Sun Oil] shall immediately pay to First Party [NOC] the costs of such uncompleted part at the end of such Exploration Period.

(D.I. 3, Exhibit A, Annex 1, EPSA ¶ 8.2, at 23–24.) Article 8.1 of the EPSA, which immediately precedes the language quoted above, states:

8.1 *Exploration Program*

reasons similar to those stated by this Court. (*See* D.I. 3, Exhibit C, Final Award at 17–20.)

818

Second Party [Sun Oil] undertakes, as a minimum exploration commitment, to spend such amounts on the Exploration Program as may be necessary to complete the Exploration Program properly. The Parties currently anticipate that the Exploration Program will cost *at least one hundred million U.S. Dollars (U.S. $100,000,000).*

(*Id.* ¶ 8.1, at 23 [emphasis added].) The Tribunal found that this language in the contract made Sun Oil liable "for the costs of the uncompleted part of the exploration program ... [without any] finding that the First Party [NOC] suffered actual loss." [30] (D.I. 3, Exhibit C, Final Award at 30.) The Tribunal went on, however, to consider the effects of Libyan law, which governs the EPSA.[31]

The Tribunal noted that, under Libyan law, liquidated damages provisions are valid; however, "damages fixed in advance by such [liquidated damages] clauses are not due 'if the debtor establishes that the creditor has not suffered any loss'[ ]" whatsoever. (*Id.* at 31 [discussing Articles 226 and 227 of the Libyan Civil Code].) The Tribunal concluded that "the debtor," Sun Oil, failed to establish that NOC had not suffered a loss:

The Arbitral Tribunal is however unable to accept SUN–OIL's contention that no damages whatsoever were suffered by N.O.C. as a result of SUN–OIL's non-completion of the exploration program ... it is clear that N.O.C. did suffer some loss by losing its chance, *within the exploration period,* to discover oil in the Contract Area and, *within the exploration period,* to obtain all the information

and data needed to assess the petroleum resources in the Contract Area.

(*Id.* [emphasis in the original]; *see also id.* at 37 ["(T)he actual loss suffered by N.O.C....consists of the damages flowing from the fact that N.O.C. did not receive, within the exploration period, the geophysical information and data needed to assess the petroleum resources in the Contract Area and to make decisions accordingly."].)

Having concluded that Sun Oil failed to make out the requisite showing under Libyan law that NOC did not suffer any loss at all, the Tribunal then went on to consider whether the entire sum called for by the contract as liquidated damages should in fact be awarded. The Tribunal focused again on Libyan law, which provides that "[t]he Judge may reduce the amount of these [liquidated] damages if the debtor establishes that the amount fixed was grossly exaggerated or that the principal obligation has been partially performed." (*Id.* at 31 [quoting Article 227(2), Libyan Civil Code].) For several reasons—including its conclusions that Sun Oil, although incorrect in claiming *force majeure,* nevertheless acted in good faith, that NOC did not make reasonable efforts to mitigate its loss, and that the cost of NOC's actual loss decreased because of the drop in global crude oil prices—the Tribunal found that NOC's recovery of liquidated damages should be limited to $20 million. (*Id.* at 36–40.)

In fashioning its damages award, the Tribunal carefully considered both the EPSA and Libyan law, as well as the submissions and arguments of the parties. The Court finds that there is nothing "completely irrational" about the Tribunal's

**30.** The Tribunal commented that although Article 8.2 of the EPSA could "lead to rather severe and rigid consequences for the party undertaking exploration operations ... it must be kept in mind that ... the EPSA is a *risk contract.*" (D.I. 3, Exhibit C, Final Award at 32 [emphasis added].) In return for a "tax-free percentage share" of any crude oil discovered and produced, Sun Oil "undertook an unconditional and absolute duty to render a counter-performance which consisted either in the timely completion of the exploration operations or, if SUN–OIL did not complete these operations within the prescribed time, in the payment by SUN–OIL of the costs of

the uncompleted part thereof." (*Id.*) Although this was a "heavy commitment," it was not a burden sufficient "to deter one dozen other petroleum companies from entering into more or less identical EPSA's with N.O.C. in or about 1980." (*Id.*)

**31.** Article 21 of the EPSA states: "This Agreement shall be governed by and interpreted in accordance with the laws and regulations of the Socialist People's Libyan Arab Jamahiriya, including the Petroleum Law." (D.I. 3, Exhibit A, Annex 1, EPSA ¶ 21, at 45.)

award or its reading of the parties' contract. Thus, mindful of the fact that "[i]t is not this Court's role ... to sit as the panel did and reexamine the evidence under the guise of determining whether the arbitrators exceeded their powers," *Norad Reinsurance Company,* 868 F.2d at 56 (citation omitted), the Court will not inquire any further.

### c. Sun Oil's Due Process Rights

■■■ Sun Oil argues that its due process rights would be violated by confirmation of this damages award. Hence, it asks that the award not be recognized based on the Convention's public policy defense. Because the Court has already concluded that the Tribunal's award is rationally derived from the language contained in the EPSA and Libyan law, Sun Oil's due process argument does not have any merit.[32]

### III. *Violation of U.S. Public Policy*

■■■ Sun Oil's final challenge to confirmation of the award rests solely on the public policy exception contained in article V, section 2(b), of the Convention. Both parties in this case agree that the public policy defense "should be construed narrowly," and that confirmation of a foreign award should be denied on the basis of public policy "only where enforcement would violate the forum state's most basic notions of morality and justice." *Parsons & Whittemore Overseas Co.,* 508 F.2d at 974 (citations omitted); *see also Waterside Ocean Navigation Co., Inc. v. International Navigation Ltd.,* 737 F.2d 150, 152 (2d Cir.1984). Not too surprisingly, however, the parties do not agree as to whether this particular case fits within such a definition of the public policy defense.

Sun Oil argues that confirmation of the award in this case would violate the public policy of the United States for three rea-

sons. First, Sun Oil contends that because confirmation would "penalize Sun for obeying and supporting the directives and foreign policy objectives of its government," other companies and individuals would be less likely to support U.S. sanctions programs, thereby diminishing "[t]he ability of the U.S. government to make and enforce policies with economic costs to U.S. citizens and corporations...." (D.I. 12 at 51.) Secondly, Sun Oil contends that confirming the award would simply be "inconsistent with the substance of United States antiterrorism policy" (*id.*), and thirdly, that it would also "undermine the internationally-supported antiterrorism policy ... by sending a contradictory signal concerning U.S. commitment to this policy and by making possible the transfer to ... Libya ... funds which could be employed to finance its continuing terrorist activities." (*Id.* at 54.) Sun Oil also presents much statistical and historical information designed to demonstrate the character of the Qadhafi Government. (*See, e.g.,* D.I. 16 at 24 [asserting that Libyan activities "threaten the most basic standards of human behavior"].) *See also supra* note 5.

The problem with Sun Oil's arguments is that "public policy" and "foreign policy" are not synonymous. For example, in *Parsons & Whittemore Overseas Company,* 508 F.2d at 974, the Second Circuit addressed this very issue, saying: "To read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility. This provision was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.'"

In *Parsons,* the court faced a situation similar to the one in this case. There, a U.S. corporation claimed *force majeure*

---

**32.** To some extent, Sun Oil's due process argument is really a claim that the Tribunal erred in its interpretation of Libyan law. A mere error of law would not, however, be sufficient grounds to refuse recognition of the award. Restatement (Third) of the Foreign Relations Law of the United States § 488 comment a (1987); *see Northrop Corp. v. Triad Int'l Mktg. S.A.,* 811 F.2d 1265, 1269 (9th Cir.), *cert. denied,* 484 U.S.

914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987); *cf. Brandeis Intsel Limited v. Calabrian Chemicals Corp.,* 656 F.Supp. 160, 165 (S.D.N.Y.1987) (not even "manifest disregard of the law" would be sufficient to deny recognition of a foreign arbitral award based on the Convention's public policy exception). Moreover, here there is no reason to believe the Tribunal made any error whatsoever.

when, following the outbreak of the Arab–Israeli Six Day War, the Egyptian government severed diplomatic ties with the U.S. and ordered most Americans out of Egypt. The U.S. corporation contended that "various actions by United States officials subsequent to the severance of American–Egyptian relations ... required Overseas [the U.S. corporation], as a loyal American citizen, to abandon the project." *Id.* Sun Oil argues that this case is different because Libya's terrorist activities, which have been condemned internationally, are hardly just a parochial interest of the U.S. On the other hand, the U.S. Government's policy towards Egypt in the 1960's, the foreign policy at issue in *Parsons*, was just "an outgrowth of an important but nonetheless conventional regional conflict." (D.I. 16 at 23.)

Despite Sun Oil's attempts to distinguish *Parsons*, it is clear that the policy objectives at issue here and the ones at issue in *Parsons* differ, at most, in degree and not in kind. This Court does not doubt that the ugly picture of the Qadhafi Government painted by Sun Oil's papers is accurate. The Court is similarly cognizant of the fact that Libya itself is not a signatory to the Convention; and hence, "if the tables were turned," as Sun Oil points out, a U.S. company would not necessarily be able to enforce an arbitral award against NOC in the Libyan courts. (D.I. 16 at 26 n. 37.) But Libya's terrorist tactics and opportunistic attitude towards international commercial arbitration are simply *beside the point.*[33]

The United States has not declared war on Libya, and President Bush has not derecognized the Qadhafi Government. In fact, the current Administration has specifically given Libya *permission* to bring this action in this Court. Given these facts and actions by our Executive Branch, this Court simply cannot conclude that to confirm a validly obtained, foreign arbitral award in favor of the Libyan Government would violate the United States' "most basic notions of morality and justice."[34]

Although Sun Oil argues that confirmation of this award would mean that U.S. dollars would end up financing Qadhafi's terrorist exploits, the Court has already pointed out that the President is empowered to prevent any such transfer through the Libyan Sanctions Regulations. Furthermore, Sun Oil's argument that U.S. companies will be less likely to support sanctions if this award is confirmed *assumes* that Sun Oil is correct on the central issue in the arbitration underlying this petition for confirmation: that is, that Sun Oil was justified in suspending performance under the EPSA. The Arbitral Tribunal, however, concluded that Sun Oil was *not* justified in suspending performance because of U.S. actions at that time. Because Sun Oil was able to present all of these arguments, regarding *force majeure* and Sun's attempts to support U.S. policy, before the Arbitral Tribunal, this Court will not reexamine that issue here.[35]

---

**33.** The Court would also note that Sun Oil has revealed its own brand of hypocrisy. It portrays its behavior as an attempt to cooperate with the anti-terrorist foreign policy of the United States. But what Sun Oil conveniently overlooks is the fact that the Qadhafi Government was *already* considered to be hostile to U.S. interests when the EPSA was negotiated. For example, Sun Oil's own papers underscore that almost one year *before* the EPSA was entered into, the U.S. Embassy in Tripoli was set on fire by a Libyan mob, and the Libyan authorities did not respond to protect the Embassy. Numerous other Libyan guerilla and terrorist efforts were also known and documented. (*See generally* D.I. 16, Exhibit 1, *Libya Under Qadhafi: A Pattern of Aggression* at A1–A13 [State Department documents outlining Libyan activities].)

**34.** In light of the circumstances presented here, the Court need not express any opinion as to whether, when, or to what extent a foreign policy objective or dispute might ever be sufficiently compelling to warrant invocation of the Convention's public policy defense against confirmation of a foreign arbitral award.

**35.** It is also important to note that the U.S. Government has demonstrated that it is more than able to indicate when a company such as Sun Oil must abandon its international contractual obligations for the good of our country. In early 1986, over four years *after* Sun Oil first invoked the *force majeure* defense and suspended performance, the President of the United States directed the promulgation of the Libyan Sanctions Regulations. *See supra* pp. 807–808. These regulations expressly prohibit, *inter alia,* the performance by any U.S. person of any unauthorized "contract in support of an indus-

## IV. Interest

### a. Prejudgment Interest

Having rejected all of Sun Oil's defenses, the Court will confirm the Arbitral Tribunal's award, and turn to the only issue remaining in this case, the propriety of granting NOC prejudgment interest.

Sun Oil makes two arguments in opposition to the award of any prejudgment interest by this Court. First, it contends that the award rendered by the Tribunal encompasses all interest owed to NOC and, consequently, an award of prejudgment interest by this Court would interfere with the Tribunal's jurisdiction. Secondly, Sun Oil argues that the balance of the equities in this case does not support the award of prejudgment interest.

■■■ Sun Oil's first argument is unpersuasive. After discussing at length the damages for which Sun Oil was liable to NOC, the Arbitral Tribunal stated the following in the conclusion section of its Final Award:

> 6.3 SUN OIL breached its contractual obligations in ceasing the exploration in 1982 on the basis of a force majeure excuse which was found unjustified;
> 6.4 On the account of such breach, SUN OIL owes damages to N.O.C. for an amount fixed at *US $ twenty millions* [sic] *(principal and interest included);*
> 6.5 As a consequence, [the Tribunal] orders SUN OIL to pay N.O.C. the amount of twenty million dollars of the United States of America....

(D.I. 3, Exhibit C, Final Award at 41 [emphasis added].) The Tribunal was obviously referring to *pre-award*, and not prejudgment (or post-award), interest. Sun Oil's interpretation would lead to an absurd result, as the Tribunal's order to pay NOC $20 million would be converted into an incentive for Sun Oil to withhold payment.

■■■ The Court will consider in more depth Sun Oil's second set of arguments, which addresses the equities in this case. A district court does have the power to grant post-award, prejudgment interest.

trial or other commercial or governmental

*See Waterside Ocean Navigation Co.,* 737 F.2d at 153–54; *Al Haddad Bros. Enterprises,* 635 F.Supp. at 210; *cf. Abromovage v. United Mine Workers of America,* 726 F.2d 972, 982 (3d Cir.1984) ("[I]n the absence of a Congressional directive to the contrary, the district court has broad discretion in determining whether to allow pre-judgment interest."). But in deciding whether to exercise its discretion to award prejudgment interest, a district court should consider four factors:

> (1) whether the claimant has been less than diligent in prosecuting the action;
> (2) whether the defendant has been unjustly enriched;
> (3) whether an award would be compensatory; and
> (4) whether countervailing equitable considerations militate against a surcharge.

*Feather v. United Mine Workers of America,* 711 F.2d 530, 540 (3d Cir.1983) (citation omitted).

Sun Oil contends that it has not been enriched by its delay in making payment. The fact is, however, that Sun Oil has had free use of the $20 million it owes NOC. Sun Oil's argument that awarding prejudgment interest in this case would be penal and not compensatory is similarly unpersuasive. As the Second Circuit stated in *Waterside Ocean Navigation Company, Inc. v. International Navigation Ltd.,* "In these days in which all of us feel the effects of inflation, it is almost unnecessary to reiterate that only if such interest is awarded will a [party] wrongfully deprived of [its] money be made whole for the loss." 737 F.2d at 154.

On the other hand, Sun Oil's final contention, that NOC has not been diligent in prosecuting its claim, is supported by the fact that NOC waited until July 24, 1989, almost two and a half years, before filing this petition to confirm the arbitral award. NOC has advanced no reason for its unusual delay. While the Court cannot hold that NOC's delay suffices to justify depriving it of all interest, it does justify refusing to award post-award interest between February 23, 1987 (the date of the arbitral

project in Libya." 31 C.F.R. § 550.205.

award) and July 24, 1989 (the date of the filing of this action to recognize and confirm the award).

A further consideration that is relevant to the fourth factor cited by the *Feather* court is the fact that in February of 1987, when the Tribunal rendered its Final Award, the Libyan Sanctions Regulations were already in place. Thus, as NOC notes (*see* D.I. 27 at 16 n.*), Sun Oil could only have paid the sum owed into a blocked account, as provided for in the Regulations. *See* 31 C.F.R. §§ 550.413, 550.511. Accordingly, mindful of the fact that this Court has discretion in determining the rate at which to award interest,[36] the Court concludes that the most equitable result is to require Sun Oil to pay post-award, prejudgment interest at the average rate of interest paid on blocked accounts from July 24, 1989 to the date of entry of judgment. The parties will be required to submit affidavits indicating the average rate of interest paid on other blocked accounts within the aforementioned period.

### b. Postjudgment Interest

■ Turning now to postjudgment interest, the Court will award interest as provided in 28 U.S.C. § 1961, from the date of judgment until such time as the arbitral award and post-award, prejudgment interest is paid into an interest-bearing blocked account. Once this occurs, Sun Oil will no longer be liable for postjudgment interest. Postjudgment interest will then be only the rate of interest earned on the funds deposited in the blocked account.

### CONCLUSION

The Court will recognize and enforce the Tribunal's award in favor of NOC and against Sun Oil in the amount of 20 million U.S. dollars, with prejudgment and postjudgment interest as described above.

A final judgment will be entered in accordance with this opinion; but execution on the judgment will be stayed, and the judgment may not be registered and transferred in accordance with 28 U.S.C. § 1963 unless the Libyan Sanctions Regulations are complied with, particularly 31 C.F.R. §§ 550.210, 550.413, and 550.511.

### FINAL JUDGMENT

For the reasons set forth in the Court's Opinion entered in this action on this date, it is

ORDERED:

1. Libyan Sun Oil Company's motion to dismiss National Oil Corporation's petition (for recognition and confirmation of the arbitral award) is hereby denied.

2. Final Judgment is hereby entered in favor of National Oil Corporation and against Libyan Sun Oil Company in the amount of Twenty Million United States Dollars ($20,000,000.00).

3. Post-award, prejudgment interest is awarded at the average rate of interest paid on blocked accounts from July 24, 1989 to date of this judgment.

4. Postjudgment interest is awarded as provided by 28 U.S.C. § 1961 from the date of this judgment until such time, if ever, when the arbitral award and post-award, prejudgment interest is paid into a blocked account; and once this occurs, postjudgment interest will then be only the rate of interest earned on the funds so deposited in the blocked account.

5. Execution on this Final Judgment is hereby stayed, and the judgment may not be registered and transferred in accordance with 28 U.S.C. § 1963 unless the Libyan Sanctions Regulations are complied with, particularly 31 C.F.R. §§ 550.210, 550.413, and 550.511.

---

**36.** Sun Oil asserts that Libyan law determines the appropriate rate of prejudgment interest. According to the Third Circuit, however, federal law controls this issue, and federal law calls for the district court to exercise its discretion. *See Sun Ship, Inc. v. Matson Navigation Co.,* 785 F.2d 59, 63 (3d Cir.1986).